682 A.2d 1177

**Surena LEMON, et al.**

v.

**Donald W. STEWART, et al.**

**No. 1982, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Sept. 26, 1996.

512

Thomas C. Summers (Law Office of Peter G. Angelos, on the brief), Baltimore, for appellants.

Kelly Hughes Iverson (Craig B. Merkle and Goodell, DeVries, Leech & Gray, L.L.P., on the brief), Baltimore, for appellee Stewart.

Jennifer S. Pressman and Semmes, Bowen & Semmes, on the brief, Baltimore, for appellee Liberty Medical Center, Inc.

William B. Whiteford, Eric R. Harlan and Whiteford, Taylor & Preston, on the brief, Baltimore, for appellee Maryland Medical.

Argued before WILNER, C.J., and MURPHY and EYLER, JJ.

WILNER, Chief Judge.

This medical malpractice action, which makes its second appearance in this Court, presents two interesting questions of first impression in Maryland: (1) when a patient is diagnosed as positive for HIV or AIDS, does the patient's health care provider have a duty to inform members of the patient's extended family, such as appellants in this case, of the patient's positive HIV/AIDS status; and (2) do such persons have a cause of action against the health care provider for breaching its duty to advise its patient of his or her positive HIV/AIDS status? We shall answer both questions in the negative and therefore affirm the judgment of the trial court.

## BACKGROUND

The fourteen appellants, who were plaintiffs below, are persons who are "either related to, or have otherwise had personal contact with" one Herbert Lemon, Sr. They initially sued appellees Donald Stewart, who is a physician, and Liberty Medical Center, Inc. in the Circuit Court for Baltimore City, seeking $5 million apiece in damages because the appel-

lees omitted to inform Mr. Lemon, appropriate health authorities, or appellants that Mr. Lemon was HIV-positive. The amended complaint alleged four causes of action as to each of the appellants—negligence, negligent misrepresentation, negligent infliction of emotional distress, and breach of fiduciary duty.

The court dismissed the amended complaint on the ground that it failed to allege a cause of action upon which relief could be granted. The negligent infliction of emotional distress count was dismissed because the court found that Maryland does not recognize an independent action of that kind. The other claims were dismissed because they were premised on the breach of some duty flowing to the appellants, and the court concluded, as a matter of law, that no such duty existed on the part of appellees to the appellants.

Appellants appealed that judgment. In an unpublished *per curiam* Opinion, we concluded that, because the claims made by appellants were for medical injury committed by health care providers, they were required to be submitted first to arbitration in accordance with the Maryland Health Claims Arbitration Act, Md.Code Cts. & Jud. Proc. art., §§ 3–2A–01, *et seq. Lemon v. Stewart,* 103 Md.App. 778 (1995). In responding to appellants' argument that, if no duty existed on the part of the health care providers, there was nothing to arbitrate, we observed that malpractice cases often turn on issues of law, but that did not excuse compliance with the mandatory arbitration process. We noted, in particular, that the proper resolution of the legal issue presented in that case may not be so clear, as the amended complaint was then framed. At p.7 of the slip opinion, we stated:

"In *Homer v. Long* [90 Md.App. 1, 599 A.2d 1193, *cert. denied,* 326 Md. 177, 604 A.2d 444 (1992) ], we observed that courts in other States, in some circumstances, have recognized a duty on the part of health care providers to persons other than their patient, at least when the patient has a readily communicable disease that clearly puts those other persons at significant risk. It does not appear that a Maryland appellate court has yet decided that issue, either

as a matter of common law or, in this context, as a matter of statutory construction. The issue is fraught with legal, medical, and public policy considerations and should not be decided in a vacuum."

We continued that, before a court is called upon to determine whether, and under what circumstances, a health care provider rendering care to a patient who is HIV-positive or who has developed AIDS has a duty to disclose his patient's condition to other persons, a factual record should be developed demonstrating that the claimant falls within a class that the court would be willing to recognize in any event. We pointed out that the amended complaint then before us failed to indicate with any precision the relationship of the various plaintiffs to Mr. Lemon or the nature of the contacts that each had with him. We thus noted that, even if there *were* a duty on the part of appellees flowing to persons other than Mr. Lemon, it was not at all clear that such a duty would flow to any of the appellants.

On that basis, we vacated the judgment and remanded the case. We directed the court to stay the proceeding pending the outcome of arbitration proceedings initiated by appellants.

When the case returned to the circuit court, the parties waived arbitration, as the statute allows them to do. Appellants then filed a new complaint in the circuit court. With three principal exceptions, the new complaint mirrors the amended complaint that was before us in the earlier appeal. The first difference is that appellants have added a new defendant—Maryland Medical Laboratory, Inc. A second difference is that the complaint alleges only two causes of action—negligence and negligent misrepresentation; claims for negligent infliction of emotional distress and breach of fiduciary duty have been dropped. Finally, in an apparent effort to satisfy our concern about the nature of the relationship between the individual appellants and Mr. Lemon, the new complaint contains a separate count for each appellant.

### FACTUAL ALLEGATIONS

■ Because this appeal is from a judgment dismissing the complaint, based upon the pleading itself, we shall accept as true those facts well-pleaded in the complaint. Any ambiguity or uncertainty in those allegations, of course, must be construed against appellants. *Figueiredo–Torres v. Nickel,* 321 Md. 642, 647, 584 A.2d 69 (1991); *Faya v. Almaraz,* 329 Md. 435, 444, 620 A.2d 327 (1993).

On July 17, 1991, Mr. Lemon, with a history of intravenous drug use, was admitted to Liberty Medical Center, Inc. complaining of slurred speech, expressive aphasia, and right-sided weakness, which appellants claim were suggestive of HIV/AIDS. While at Liberty, Lemon was under the care of Dr. Stewart. A number of tests, mostly neurological in nature, were conducted. On July 19, 1991, an ELISA (Enzyme–Linked Immunosorbent Assay) test was submitted by Liberty to Maryland Medical Laboratory. On July 22, the laboratory reported to Liberty a reactive ratio of 4.34, which is positive for the development of antibodies to the HIV organism. That same day, a Western Blot test was performed; on July 24, the laboratory reported a similar result from that test.

Mr. Lemon was discharged from the hospital on July 21—prior to its receipt of the test results—as HIV negative. His discharge summary, which was not actually prepared until October, incorrectly stated that an HIV study was performed and showed that Lemon was HIV-negative. There is no allegation that Mr. Lemon ever saw the discharge summary or was told anything about his HIV/AIDS status, one way or the other, by any of the three defendants.

Upon his discharge, Mr. Lemon returned to the home of his sister—appellant Surena Lemon—where, for the next nine months, she and the other thirteen appellants cared for him in varying ways. The other appellants included another sister, two brothers, four children, and five nieces or nephews. In the introductory part of the complaint, appellants allege that they each had "daily or frequent" but "varying degrees" of contact with Lemon. Some of them had "direct physical

contact with Herbert Lemon's bodily secretions, including sputum and blood." The contact was in the nature of bathing and shaving Mr. Lemon, "assisting in personal hygiene matters," helping him to the rest room, cleaning his room and bed, washing his clothes, transferring him from bed to chair, and carrying him around the house. The "younger plaintiffs," it was alleged, came into contact with him through "expressions of affection, including, but not limited to kissing, touching, hugging, and other familial gestures."

These general allegations are made somewhat more specific in the individual counts. Surena Lemon, for example, alleged that, through bathing Mr. Lemon and changing his diaper, she was exposed to his blood, urine, and feces, as well as fluids from bedsores and from his eyes. Annie Bell Mitchell, another sister, claimed that, through washing, feeding, and otherwise assisting Mr. Lemon, she came into contact with his urine, feces, and other bodily secretions, including blood from cuts. We need not recite the allegations in each of the fourteen counts; suffice it to say that they are generally similar to those already recounted. It is noteworthy, however, that nowhere in the complaint is it alleged that any of the appellants were sexual partners of Mr. Lemon, that they shared needles with him, or that there was, in fact, any direct transmission of his blood to their own.

In the spring of 1992, Mr. Lemon was readmitted to Liberty under the care of Dr. Stewart, and it was then that he was first informed that he had tested positive for HIV/AIDS. "Virtually all" of the appellants were then tested for HIV and found not to have the virus.

The gravamen of the fourteen lawsuits is the "daily fear" that the appellants have that, based upon their exposure to Mr. Lemon during the nine months between his discharge from Liberty in July, 1991, and the revelation of his infected status in the spring of 1992, they may yet develop the virus and the deadly disease. They contend that it can "take up to 15 years to show any signs or symptoms" of the disease. They aver that, had the defendants informed Mr. Lemon, the

appropriate health authorities, or them in July, 1991 that Mr. Lemon has tested positive for AIDS,[1] they would have taken measures to protect themselves and to assure that they did "not come in contact with Mr. Lemon's bodily fluids or secretions." In that regard, they also contend that, once Mr. Lemon learned of his condition, he ceased "all further contact" with appellants and that he would have done so in July, 1991, had he been made aware then of his condition.

In the section of the complaint averring negligence, appellants contend that

(1) pursuant to "statute and/or regulation in Maryland, as well as internal guidelines and procedures," the defendants had a duty to report Mr. Lemon's status to the appropriate health officer for Baltimore City and to the other defendants, and that, had they done so, appellants would have been notified of that status;

(2) the defendants had a "statutory duty" under Md.Code, Health General art., § 18–602 and related regulations not to expose them carelessly to infected persons such as Mr. Lemon; and

(3) the defendants had a statutory and common law duty of care to disclose to appellants "and/or the appropriate health authorities, and/or each other" the fact that Mr. Lemon had tested positive for HIV/AIDS, and that they were negligent in failing to make those disclosures.

The claim of negligent misrepresentation is founded upon the same alleged duties but adds that, by their silence, the defendants negligently misrepresented to appellants either that Mr. Lemon had not been tested for HIV/AIDS or that he had tested negatively.

---

1. There is an ambiguity in the complaint as to whether Mr. Lemon had tested positive for AIDS or only for HIV in July, 1991. At various points, they contend he tested positive for "HIV/AIDS"; at other points, they contend that he had AIDS; in the allegations relating specifically to the two tests, they aver only that the tests showed the development of antibodies to the HIV organism.

## *DISCUSSION*

### Introduction

As indicated above, appellants have alleged at least four different duties on the part of the defendants, which, to some extent, have been lumped together and mingled. These alleged duties are quite distinct, however, and need to be separated. As we read the complaint, appellants allege one duty on the part of the defendants to notify each other of Mr. Lemon's status; they allege a second duty to notify appellants, individually; they assert a third duty to notify Mr. Lemon; and they allege a fourth duty to inform the appropriate health authorities in Baltimore City.

### Duty to Notify Each Other

The alleged duty on the part of the defendants to notify each other is the most lacking in clarity, relevance, and foundation. It is evident from the complaint that Maryland Medical Laboratory, Inc.—the defendant that actually conducted the two tests—did accurately report the results of the tests to Liberty. To the extent that it had a duty to do so, therefore, that duty was satisfied. We are unable to perceive any separate duty that the laboratory had to report the test results to Dr. Stewart. Indeed, there is no averment that it even knew of Dr. Stewart's existence; the complaint alleges that the hospital, not Dr. Stewart, sent the material to the laboratory for testing. As between Liberty and Dr. Stewart, there is no averment (1) of the basis of any specific duty that the hospital had to inform Dr. Stewart of the laboratory report, which apparently was placed in Mr. Lemon's hospital record, or (2) that the doctor was not aware of the report made to Liberty or that Liberty in any way prevented him from learning of it. Nor can we discern any possible duty Liberty or Dr. Stewart had to the laboratory to report what the laboratory already knew and had reported to Liberty. In short, to the extent that the complaint rests on some duty among the three defendants to report to each other, it is wholly lacking a foundation.

### Duty to Inform Appellants

 The common law duty of care owed by a health care provider to diagnose, evaluate, and treat its patient ordinarily flows only to the patient, not to third parties. Thus, it has often been said that a malpractice action lies only where a health care provider-patient relationship exists and there has been a breach of a professional duty owing to the patient. *Hoover v. Williamson*, 236 Md. 250, 203 A.2d 861 (1964); *Miller v. Schaefer*, 80 Md.App. 60, 559 A.2d 813 (1989), *aff'd*, 322 Md. 297, 587 A.2d 491 (1991); *Homer v. Long, supra*, 90 Md.App. 1, 599 A.2d 1193.

As we indicated, in *Homer v. Long*, we correctly observed that courts in other States, in some limited circumstances, have recognized a duty on the part of health care providers to persons other than their immediate patient, "mostly involving situations in which the patient has, or is thought to have, a communicable disease or otherwise presents a clear danger to a specific person." *Id.* at 10, 599 A.2d 1193. None of the cases that we cited for that proposition involved a duty to inform a third person that the patient was HIV-positive or had AIDS. They each involved either a communicable disease that was actually transmitted to the plaintiff or that was easily transmittable through casual contact or, as in *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 131 Cal. Rptr. 14, 551 P.2d 334 (1976), a special relationship between the patient and an identified or identifiable third person that put that third person in particular and foreseeable danger. *Cf. Henley v. Prince George's County*, 305 Md. 320, 503 A.2d 1333 (1986); *compare Furr v. Spring Grove State Hosp.*, 53 Md.App. 474, 454 A.2d 414, *cert. denied*, 296 Md. 60 (1983). No case has been cited to us imposing a common law duty on the part of a health care provider to inform persons other than the provider's patient of the patient's positive HIV status, and we have found none.

We need not decide here whether Maryland would recognize such an extended duty or the circumstances under which it might do so, for it is clear to us that this is not one of the

possible circumstances in any event. We reach that conclusion for two reasons, which we believe are, to some extent, interrelated.

In our earlier Opinion in this case, we noted that whether the defendants had any duty of disclosure flowing directly to appellants might depend on an analysis of the medical and epidemiological aspects of HIV and its transmission. If appellants could not show that they were identifiable potential victims of non-disclosure and were in significant and foreseeable risk of acquiring the virus through contact with Mr. Lemon, no common law duty of disclosure would flow to them, even under the out-of-State cases cited in *Homer v. Long, supra,* 90 Md.App. 1, 599 A.2d 1193.

The medical evidence we hoped would be generated on remand, which was not so generated and thus is completely lacking in the record before us, was fortuitously supplied by the Court of Appeals in *Faya v. Almaraz, supra,* 329 Md. 435, 620 A.2d 327. That case involved an action by former patients of an oncological surgeon who, though knowing that he was HIV-positive, nonetheless performed invasive surgery on them without disclosing his condition. The gist of the complaints was that the defendant (and, vicariously, the hospital that allegedly employed him) acted wrongfully in operating on the plaintiffs without disclosing his condition.

The holding in *Faya* is not directly relevant here, as the case did not involve any duty flowing to third parties. What are pertinent, however, are the Court's conclusions with respect to the transmission of HIV, which are founded upon and are consistent with published and generally accepted medical studies. At 445, 620 A.2d 327, the Court wrote:

> "HIV is a fragile virus that can survive only in the habitat of bodily fluids. While others can carry HIV, the only fluids that can transmit the virus are blood, semen, vaginal fluids and breast milk. For the virus to pass from one person to another, at least one such fluid of the carrier must enter the body of the other.... HIV is primarily transmitted through unprotected sexual intercourse, the sharing of con-

taminated syringes among intravenous drug users, [and] blood transfusions, although transmission by the latter route has greatly decreased since the Red Cross began testing the blood supply in 1985."

The Court continued:

"The virus is only transmitted if it reaches the bloodstream of the transmittee. That is, the fluid of the carrier must pass through some channel to the transferee's blood system. Hence, unprotected sex, needle-sharing, pregnancy and nursing are relatively efficient modes of transfer, while others are not; for HIV to pass in non-sexual, non-needle-sharing contexts, blood must pass both through a wound in the carrier and into a wound in the transferee. In short, the two parties' blood must commingle. *Thus, there have been no reports of HIV transmission through casual contact.*"

(Emphasis added).

Accepting a policy statement from the House of Delegates of the American Medical Association, the Court held that, although transmission of HIV from an infected physician to his patient during invasive surgery was unlikely, it was a "theoretical possibility" and therefore foreseeable. *Id.* at 449, 620 A.2d 327. Because of the potentially deadly consequence of such transmission, the AMA, in both that policy statement and its Code of Medical Ethics, urged that infected physicians should not engage in activity that creates a risk of transmission. The Court thus declared that it was unable to conclude that no duty to the patient, of either restraint or disclosure, existed. Turning then to the question of damages, the Court held that, where the claim is based not on actual transmission but simply on the fear that transmission might have occurred, the plaintiff-patients could recover only for a period "constituting their reasonable window of anxiety," which would necessarily end when they were tested and learned that they did not have the virus. *Id.* at 456, 620 A.2d 327.

*Faya* clearly circumscribes an action for non-disclosure even by the patient, and it must therefore, necessarily, circumscribe

any such action by a third person. The Court recognized a duty of disclosure to the patient only because of the medically documented prospect of transmission during invasive surgery. That is not the case here. With but one exception, the contacts between Mr. Lemon and appellants, as alleged in the complaint, were either casual in nature or involved exposure to bodily secretions—urine, feces, saliva, serum—which have not been shown to cause transmission. To the extent some of the appellants allege generally that they were "exposed to" Mr. Lemon's blood, they provide no specific statement as to the nature of that exposure—whether it occurred under circum-stances, such as in the situation of surgery, in which his blood could have been commingled with theirs.

To recognize a common law duty on the part of health care providers to inform persons such as appellants would not only be thoroughly impractical but would constitute a wholly unwarranted invasion of the patient's privacy. Quite apart from consent, unless the patient informs the provider of each such person, there would be no practical way for the provider to know whom to notify. Here, as noted, there were 14 persons—most of whom were collateral relatives, none being a spouse, other sexual partner, or needle-sharer. Although the complaint alleges that the maladies that led Mr. Lemon to the hospital in the first place were symptomatic of AIDS, there is no allegation that he informed the defendants of the appellants' existence or identity, much less that he asked that they be notified if his test results came back positive. In making this point, we do not mean to suggest that there would be any duty to notify such persons even if they *were* identified, but simply to note that, where they are not identified, there is no practical way in which the provider *could* notify them.

██ Indeed, in addition to the impracticality of imposing such a duty, there is a compelling substantive public policy reason not to impose it—the privacy rights of the patient. We need not consider here whether Maryland would go as far as some other States in actually imposing civil or disciplinary liability on a health care provider for improperly disclosing a

patient's condition to third persons. *See,* for example, *Vassiliades v. Garfinckel's, Brooks Bros.,* 492 A.2d 580 (D.C.App. 1985); J. Zelin, *Physician's Tort Liability For Unauthorized Disclosure of Confidential Information About Patient,* 48 A.L.R. 4th 668 (1986). *Compare Humphers v. First Interstate Bank,* 298 Or. 706, 696 P.2d 527 (1985) (*en banc*). It will suffice to recognize that the relationship between a health care provider and its patient is one of trust and confidence and that, absent a statute permitting otherwise, the patient has a right to assume that his medical condition will not voluntarily be disclosed by the provider to other persons without the patient's consent.[2] This is, we believe, especially true with respect to HIV status, knowledge of which on the part of other persons may subject the patient to ostracism, discrimination, and humiliation.

The General Assembly has recognized the special concerns surrounding the discovery of a positive HIV status and, by statute, has provided a balance between the undisputed public health hazard presented by careless conduct on the part of HIV-positive persons and the right of such persons to privacy with regard to their medical condition. Md.Code Health–General art., § 18–336, as it existed in 1991 and 1992—the relevant period with respect to this case—required health care providers to obtain informed written consent before obtaining a blood sample for HIV testing, to provide the patient with certain pre-testing information, and, if the test proves positive, to

(1) notify *the patient* of the positive result;

(2) provide the patient with a Department of Health and Mental Hygiene publication describing available counseling services;

---

**2.** Legislative acceptance of this right of privacy, or non-disclosure, is implicit from Md.Code Health–General art., § 18–338(e) and (g), discussed *infra.* Those sections provide immunity for physicians and other health care providers who disclose the patient's status in accordance with the statute, stating that, in that circumstance, they may not be held liable for "breach of patient confidentiality."

(3) "[c]ounsel the individual to inform all sexual and needle-sharing partners";

(4) "[o]ffer to assist in notifying the individual's sexual and needle-sharing partners"; and

(5) "[i]f necessary, take action appropriate to comply with § 18–337 of this title." [3]

Section 18–337, at the time, provided that, if a patient who was informed of his positive HIV status under § 18–336 refused to notify his or her sexual and needle-sharing partners, the person's physician "may inform the local health officer and/or the individual's sexual and needle-sharing partners" of the patient's identity and "[t]he circumstances giving rise to the notification." If the local health officer was notified, he or she was then obliged to enforce the provisions of §§ 18–208 through 18–213, which deal generally with the control of infectious and contagious diseases but which appear to have little relevance to this case. The local health officer was also obliged to refer the patient and any known sexual or needle-sharing partners to appropriate services for the care, support, and treatment of HIV infected individuals.

Section 18–337(e) made clear that a physician acting in good faith "may not be held liable in any cause of action for choosing not to disclose information related to a positive test result for the presence of [HIV] to an individual's sexual and needle-sharing partners."

This statute incontestably reinforces our conclusion that no duty exists on the part of physicians or other health care providers to inform persons such as appellants of a patient's positive HIV status. If they have no obligation to inform sexual and needle-sharing partners of the patient and cannot be held liable for choosing not to inform them, surely they can have no duty to notify persons far less likely to acquire the virus from the patient.

---

**3.** Sections 18–336 and 18–337 were amended in 1992, 1994, and 1995, but not in a way that would materially affect the decision in this case.

## Duty To Notify Mr. Lemon

■ There is no doubt that Liberty and Dr. Stewart had a duty, under common law and by statute, to inform Mr. Lemon of his positive HIV status. Whether the laboratory had such a duty is not so clear but, in any event, is irrelevant. The issue is whether appellants can base their causes of action on the breach of a duty to Mr. Lemon. We conclude that they cannot.

The theory asserted by appellants, of course, is that, had Mr. Lemon been informed of his condition, he would have taken special precautions to avoid any transmission of the virus. Indeed, notwithstanding his apparently helpless condition—depending entirely on others to be bathed, cleansed, and transported around the house—it is alleged that, had he known of his condition, he would have "ceased all further contact with the Plaintiffs." We must accept that statement as true, of course, but we do so with a healthy scoop of skepticism, as we do the further allegation that, despite Mr. Lemon's dire condition and knowledge that he was an intravenous drug user, appellants were unaware that he was HIV-positive.

Had any of the appellants been a sexual or needle-sharing partner of Mr. Lemon, an arguable claim could be made that they were foreseeably potential victims of any breach of the duty to Mr. Lemon and ought to have a cause of action for that breach, to the extent they could prove injury. *See,* for example, *Reisner v. Regents of University of California,* 31 Cal.App.4th 1195, 37 Cal.Rptr.2d 518 (Cal.App.1995), holding that the sexual partner of a patient had a cause of action against the patient's physician and hospital for failing to inform the patient that she had been contaminated with HIV-infected blood and counseling her how to prevent the spread of the virus. We note that the plaintiff in that case had, in fact, acquired the virus from the patient through unprotected sexual intercourse. As noted, the Legislature has specifically allowed physicians to inform those categories of third parties

of the patient's identity and status if the patient refuses to do so.

The argument in favor of recognizing a cause of action on the part of sexual partners and needle-sharers, to the extent that it might find acceptance (notwithstanding § 18–337(e)) even as to those categories of persons, cannot be made in favor of other groups, such as appellants. They have not been singled out for protection by the Legislature, and there is no compelling reason for special protection to be afforded by expanding the common law. It still comes down to the fact that, based on present medical knowledge, those persons were not in substantial risk of acquiring HIV from Mr. Lemon. As to them, there is no greater need to create a vicarious cause of action for failure to disclose to Mr. Lemon a positive HIV status than there would be for failure to tell Mr. Lemon that he had cancer, or some other disease or condition that could conceivably cause inconvenience, anguish, or expense to the patient's family.

### Duty to Inform Local Health Authority

For essentially the same reasons discussed with respect to the failure to inform Mr. Lemon, we conclude that appellants have no vicarious cause of action based on the defendants' failure to report Mr. Lemon's condition to the Baltimore City Health Department. As noted, although the health department, if so notified, would have been obliged to refer Mr. Lemon and any sexual or needle-sharing partners to support and treatment services, it would have had no obligation to inform appellants. Thus, the failure to notify the health department was of no greater detriment to appellants than the failure to inform Mr. Lemon directly.

### Conclusion

For the reasons stated, we conclude that the defendants had no duty to inform appellants of Mr. Lemon's HIV status and that appellants have no cause of action against the defendants based on their failure to inform Mr. Lemon, each other, or the health department. The complaint, as to both negligence and

negligent misrepresentation, was therefore properly dismissed for failure to state a cause of action upon which relief could be granted.

JUDGMENTS AFFIRMED; APPELLANTS TO PAY THE COSTS.