UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 03-2166

JANE DOE,

Plaintiff - Appellant,

versus

PHARMACIA & UPJOHN, INCORPORATED,

Defendant - Appellee.

Appeal from the United States District Court for the District of Maryland, at Greenbelt.  Peter J. Messitte, District Judge.  (CA-03-702-PJM)

Argued:  October 28, 2004               Decided:  February 4, 2005

Before NIEMEYER, KING, and SHEDD, Circuit Judges.

Order of certification of questions of law to the Court of Appeals of Maryland.

**ARGUED:** Stephen Bennett Mercer, SANDLER & MERCER, P.C., Rockville, Maryland, for Appellant.  Stephen Edward Marshall, VENABLE, L.L.P., Baltimore, Maryland, for Appellee.  **ON BRIEF:** Paul F. Strain, Mitchell Y. Mirviss, Mark D. Maneche, VENABLE, L.L.P., Baltimore, Maryland, for Appellee.

PER CURIAM:

Jane Doe appeals from the dismissal of her amended complaint for failure to state a claim upon which relief can be granted.[1] See Fed. R. Civ. P. 12(b)(6). In her amended complaint, Jane Doe alleges generally that John Doe contracted the human immunodeficiency virus ("HIV") while he was employed by Pharmacia & Upjohn, Incorporated ("Pharmacia") as a laboratory technician at Pharmacia's Montgomery County, Maryland, viral production facility; that Pharmacia negligently tested and informed John Doe that he did not have HIV; and that she subsequently contracted HIV from John Doe through unprotected marital relations. The district court dismissed the amended complaint, which (for our purposes) is grounded in Maryland negligence law, based on its conclusion that Pharmacia did not owe a legal duty of care to Jane Doe.

Pursuant to Maryland Code Ann., Cts. & Jud. Proc. §§ 12-605 and 12-606, we now certify the following questions of Maryland law to the Court of Appeals of Maryland:

> (1) For purposes of a negligence cause of action, does a commercial manufacturer of two strains of HIV ("HIV-1" and "HIV-2"), which conducts blood tests on its employees who have been exposed to HIV while on the job, and which manufactures test kits for HIV-1, owe a legal duty to its employees' spouses to exercise reasonable care in conducting testing, including testing for both strains of the virus?

---

[1] The district court authorized Jane Doe to proceed under a fictitious name. We refer to Jane Doe's husband, who is not a party to this litigation, as "John Doe."

2

(2) For purposes of a negligence or negligent misrepresentation cause of action, does a commercial manufacturer of two strains of HIV ("HIV-1" and "HIV-2"), which conducts blood tests of its employees who have been exposed to HIV while on the job, owe a legal duty to its employees' spouses to exercise reasonable care in informing the employees of the nature of the test results, including the fact that a "false positive" test result for HIV-1 may indicate an HIV-2 infection?

The answers to these questions, which are potentially determinative of this appeal, do not appear to be directly controlled by any Maryland appellate decision, constitutional provision, or statute. We acknowledge that the Court of Appeals of Maryland may reformulate these questions. We also emphasize that these questions are premised on the factual allegations of Jane Doe's amended complaint which, as explained below, indicate (1) that Pharmacia was specifically aware of many pertinent facts, including the identity of Jane Doe as John Doe's wife and sexual partner and that the test results could indicate the presence of HIV-2; and (2) that Pharmacia had the capability to test its employees for both HIV-1 and HIV-2.

Counsel of record for Jane Doe is Stephen B. Mercer, Sandler & Mercer, P.C., 27 West Jefferson Street, Suit 201, Rockville, Maryland, 20850. Counsel of record for Pharmacia is Stephen E. Marshall, Venable Baetjer and Howard LLP, Two Hopkins Plaza, Suite 1800, Baltimore, Maryland, 21201.

Jane Doe alleges the following facts in her amended complaint which, for purposes of this appeal, are not disputed. See GE Inv. Private Placement Partners II v. Parker, 247 F.3d 543, 546 (4th Cir. 2001) ("Because the complaint was dismissed pursuant to Rule 12(b)(6), we assume the facts alleged in the complaint are true").

Jane Doe has been married to, and living as husband and wife with, John Doe since 1971. (Amended Complaint ("A.C.") ¶ 1). Between 1974 and 1991, John Doe was employed by Pharmacia as a laboratory technician at its Montgomery County, Maryland, viral production facility. (A.C., ¶ 4). Pharmacia cultivated pathogens at this facility for use in diagnostic test strips manufactured and sold by Pharmacia and others. (A.C. ¶ 3). John Doe's primary job responsibilities included the daily feeding, growing, and harvesting of pathogens for large scale propagation. (A.C. ¶ 4). Pharmacia closed this facility in 1991. (A.C. ¶ 4).

In 1984, researchers discovered that the primary causative viral agent of acquired immune deficiency syndrome ("AIDS") is HIV. (A.C. ¶ 7). By 1986, two types of HIV, designated as "HIV-1" and "HIV-2," had been discovered. (A.C. ¶ 7). The first reported case of HIV-2 in the United States was in 1987, and there have been few reported HIV-2 cases in the United States. (A.C. ¶ 7). Both HIV-1 and HIV-2 have the same modes of transmission and are associated with AIDS. (A.C. ¶ 7). Compared with persons infected with HIV-1,

those with HIV-2 are less infectious early in the course of infection. (A.C. ¶ 7).[2]

Beginning in 1984, approximately 80% of the viral production at the Pharmacia facility where John Doe worked was HIV-1 and HIV-2. (A.C. ¶ 3). Pharmacia cultivated and harvested HIV cultures on a daily basis and shipped them to another facility for incorporation into a test for HIV antibodies. (A.C. ¶ 3). Between 1985 and 1991, John Doe was exposed to high concentrations of HIV-1 and HIV-2 while on the job. (A.C. ¶ 9).

At some point around 1985, Pharmacia (through its agent) began testing its employees, including John Doe, who were exposed to HIV in the workplace every six months. (A.C. ¶¶ 11, 12). Pharmacia manufactured the test strips that were used in this testing. (A.C. ¶ 11). Although Pharmacia was aware of the existence of HIV-2, commercial test kits were not available in the United States to test for an injurious exposure to HIV-2 before 1991 because of the statistically insignificant incidence of the virus. (A.C. ¶ 7). Therefore, Pharmacia's testing was limited to detection of HIV-1. (A.C. ¶ 10). However, Pharmacia possessed the materials, knowledge, and capability to manufacture its own test strips to detect HIV-2. (A.C. ¶ 10).

---

[2]In <u>Faya v. Almaraz</u>, 620 A.2d 327 (Md. 1993), the Court of Appeals of Maryland, finding that a surgeon who had AIDS owed a duty to his patients to warn them of his condition, took judicial notice of several facts about HIV and AIDS.

The testing conducted by Pharmacia consisted of a two-part protocol whereby an initial screen (the Elisa test) would, if positive, be followed by a confirmatory test (the Western Blot) for HIV-1. (A.C. ¶ 11). By 1989, Pharmacia was aware that the HIV tests being used would detect core proteins present in both HIV-1 and HIV-2, and that while the HIV-2 proteins (among other factors) could cause a positive result on the Elisa test, the Western blot test would confirm only the presence of HIV-1. (A.C. ¶ 13). Thus, as of 1989, a person infected with HIV-2 could test positive on the Elisa test but negative on the Western blot test. (A.C. ¶ 14). This type of result was considered to be a "false positive" for HIV-1. (A.C. ¶ 14).

John Doe consistently tested negative until 1989, when he received a positive result on the Elisa test. (A.C. ¶¶ 11, 22). John Doe was retested, and the result was negative. (A.C. ¶ 22). John Doe's subsequent tests were negative. (A.C. ¶ 22).

Pharmacia did not counsel or warn either John Doe, Jane Doe, or its testing agent about the potential negative ramifications of a "false positive" test. (A.C. ¶¶ 15, 16, 18, 19). However, Pharmacia (and/or its agent) did tell John Doe after the "false positive" test that the Western Blot test failed to confirm the presence of HIV-1; that the test result could have been caused by factors unrelated to exposure to HIV; that the test result did not indicate that he was infected with the virus that causes AIDS; and

6

that the test result did not indicate a significant risk to his health. (A.C. ¶ 27). Neither Jane Doe nor John Doe was aware that a "false positive" test could indicate an HIV-2 infection. (A.C. ¶¶ 20, 21).

In October 2000, John Doe was admitted to the hospital where he was found to be suffering from multiple AIDS-like conditions. (A.C. ¶ 5). Although John Doe tested negative for HIV-1, he tested positive for HIV-2 and was diagnosed as having AIDS. (A.C. ¶ 5). John Doe became infected with HIV-2 while handling the virus as a Pharmacia employee. (A.C. ¶ 6).[3]

Upon learning that he was infected with HIV-2, John Doe immediately informed Jane Doe. (A.C. ¶ 29). Subsequent testing of Jane Doe revealed that she also is infected with HIV-2. (A.C. ¶ 29). Jane Doe was John Doe's only sexual partner and was known as such by Pharmacia. (A.C. ¶ 30). Jane Doe became infected with HIV-2 because of unprotected marital relations with John Doe. (A.C. ¶ 30). The Does would not have engaged in unprotected marital relations had they been aware that John Doe was infected with HIV-2. (A.C. ¶ 29).

Pharmacia was aware at times pertinent to this case that HIV-2 was a pathogen that could have significant consequences, including

---

[3]Jane Doe attached to the amended complaint a report from her medical expert who opines within a reasonable degree of scientific certainty that John Doe became infected during the course of his employment by Pharmacia.

death for humans, and that it could be transmitted by sexual contact and exchange of body fluids. (A.C. ¶ 32). Pharmacia also knew that the spread of HIV-2 between sexual partners could be effectively prevented through behavior modification and the use of barrier devices. (A.C. ¶ 33). Pharmacia also learned, subsequent to the conclusion of John Doe's employment, that at least one co-worker of John Doe's at the Montgomery County facility had unexpectedly become infected with one or more lethal pathogens that had been propagated in that facility; however, despite having this knowledge, Pharmacia did not warn the Does of any danger. (A.C. ¶ 41).

II

Jane Doe filed this action in Maryland state court. After Pharmacia removed this case from state court and moved to dismiss pursuant to Rule 12(b)(6), Jane Doe filed an amended complaint with nine causes of action. Pharmacia then moved to dismiss the amended complaint. Following briefing on the motion to dismiss, the district court conducted oral argument. At the conclusion of the hearing, the district court orally granted the motion and dismissed the case. The district court subsequently denied Jane Doe's motion for reconsideration.

This appeal involves only five of Jane Doe's causes of action, all of which sound in negligence.[4]  Specifically, Jane Doe asserts in these five causes of action claims for negligent operation of an HIV production facility (Count I); negligent failure to rule out an HIV-2 infection (Count II); negligent failure to test for HIV-2 (Count III); negligent failure to warn of cross reactivity (Count V); and negligent misrepresentation (Count IX).  Jane Doe asserts that Pharmacia breached a duty of care to her -- as a person known to Pharmacia to be at risk of contracting HIV-2 from John Doe -- by "failing to rule out that John Doe had been injuriously exposed to HIV-2 at [Pharmacia's] production facility" (Count II); by "failing to test . . . John Doe for HIV-2 where John Doe was exposed to HIV-2 at [Pharmacia's] production facility" (Count III); by "failing to warn John Doe . . . that HIV-2 would produce a 'false positive' HIV-1 test result" (Count V); and by "negligently misrepresenting to John Doe that his 'false positive' test result for HIV-1 did not indicate the presence of the virus that causes AIDS and did not indicate a significant health risk."[5]  Jane Doe alleges that she became infected with HIV-2 (through unprotected marital relations

[4]Jane Doe withdrew three causes of action (Counts IV, VI, and VII) in the district court, and she has not appealed the dismissal of another cause of action (Count VIII).

[5]In Count I, Jane Doe does not assert a specific duty owed by Pharmacia to her.  Rather, Jane Doe's allegations relate more generally to Pharmacia's alleged duties to its employees.

9

with John Doe) as a direct and proximate result of Pharmacia's breach of these asserted duties.

The district court held that each of these claims fails as a matter of law based on the lack of a legal duty of care owed by Pharmacia to Jane Doe. The district court specifically relied upon Adams v. Owens-Illinois, Inc., 705 A.2d 58 (Md. App. 1998), in which the plaintiff contended her husband was exposed to asbestos in his workplace and that she developed asbestosis as a result of handling his work clothes. The Maryland Court of Special Appeals held that the plaintiff's negligence claim against her husband's employer failed as a matter of law because the employer "owed no duty to strangers based upon providing a safe workplace for employees." Id. at 66. The district court concluded that Adams "suggest[s] that the Maryland courts would, if asked to decide this case, hold that there is no duty that an employer has with regard to alleged deficient workplace standards to the spouse of an employee." J.A. 74.

In her motion for reconsideration, Jane Doe argued that the district court failed to consider another Maryland intermediate appellate decision, Lemon v. Stewart, 682 A.2d 1177 (Md. App. 1996), which she contends is in conflict with Adams. In Lemon, the Court of Special Appeals rejected a medical malpractice claim brought by extended family members against a physician because he failed to inform them that his patient -- their relative -- was

10

HIV-positive.  Although the Court of Special Appeals recognized that the physician had a duty to inform the patient of his condition, the extended family members could not base their claim on the breach of that duty.  The Court of Special Appeals did note, however, that "[h]ad any of the appellants been a sexual or needle-sharing partner of [the patient], an arguable claim could be made that they were foreseeably potential victims of any breach of the duty to [the patient] and ought to have a cause of action for that breach, to the extent they could prove injury."  Id. at 1184.

Because of this purported conflict, Jane Doe asked the district court to certify the case to the Court of Appeals of Maryland.  The district court found that Lemon -- which involved duties to third parties arising from the physician-patient relationship -- is inapplicable and that the part of the Lemon opinion relied upon by Jane Doe is dicta.  The district court reiterated its holding that this case is controlled by Adams, and it therefore found certification to the Maryland Court of Appeals to be inappropriate.

                                    III

On appeal, Jane Doe contends that the district court erred in holding under Maryland law that Pharmacia did not owe a duty of care to her.  Under Maryland law, a necessary element of a cause of action for both negligence and negligent misrepresentation is that the defendant owed a legal duty of care to the plaintiff.  Patton

11

v. United States of America Rugby Football, 851 A.2d 566, 570 (Md. 2004) (negligence); Law v. International Union of Operating Engineers Local No. 37, 818 A.2d 1136, 1145 (Md. 2003) (negligent misrepresentation).

A legal duty is "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." Patton, 851 A.2d at 571 (internal quotation marks omitted). The existence of a legal duty is a question of law to be decided by the court, and in deciding whether a legal duty exists courts must consider a variety of factors including the foreseeability of harm to the plaintiff; the degree of certainty that the plaintiff suffered the injury; the closeness of the connection between the defendant's conduct and the injury suffered; the moral blame attached to the defendant's conduct; the policy of preventing future harm; the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach; and the availability, cost and prevalence of insurance for the risk involved. Id. at 570-71. "The determination of whether a duty exists under Maryland law is the ultimate function of various policy considerations as adopted by either the Legislature, or, if it has not spoken, . . . by Maryland courts." Grimes v. Kennedy Krieger Institute, Inc., 782 A.2d 807, 850 (Md. 2001).

No Maryland appellate decision, constitutional provision, or statute appears to address the precise questions presented in this case.[6] The answers to the certified questions are potentially determinative of this appeal because Jane Doe's claims, sounding in negligence, may go forward only if Pharmacia owed her a legal duty. Therefore, the questions are properly subject to review by the Court of Appeals of Maryland on certification.

IV

Accordingly, pursuant to the privilege made available by the Maryland Uniform Certification of Questions of Law Act, we hereby ORDER: (1) that the questions stated above be certified to the Court of Appeals of Maryland for answer; (2) that the Clerk of this Court forward to the Court of Appeals of Maryland, under the official seal of this Court, a copy of this Order, together with the original or copies of the record before this Court to the extent requested by the Court of Appeals of Maryland; and (3) that the Clerk of this Court fulfill any request for all or part of the record simply upon notification from the Clerk of the Court of Appeals of Maryland.

QUESTIONS CERTIFIED

---

[6]Pharmacia contends that the recent decision in <u>Dehn v. Edgecombe</u>, No. 117, 2005 Westlaw 77094 (Md. Jan. 14, 2005), dictates that it did not owe a legal duty to Jane Doe. However, because the facts and circumstances of <u>Dehn</u> are distinguishable from the facts of this case, we are not convinced that <u>Dehn</u> is controlling.