599 A.2d 1193

**James J. HOMER**

v.

**S. Eugene LONG.**

**No. 371, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Jan. 6, 1992.

Certiorari Denied April 9, 1992.

Gary I. Strausberg (Susan M. Fila and Janet & Strausberg, on the brief), Baltimore, for appellant.

Daniel C. Costello (Andrew E. Vernick and Wharton, Levin, Ehrmantraut & Klein, P.A., on the brief), Annapolis, for appellee.

Argued before WILNER, C.J., and MOYLAN and CATHELL, JJ.

WILNER, Chief Judge.

The American Psychiatric Association has declared, in clear and unmistakable terms, that sexual intimacies between a psychiatrist and his or her patient are unethical and forbidden.[1] As noted by L. Jorgenson, R. Randles, and L. Strasburger, *The Furor Over Psychotherapist–Patient Sexual Contact: New Solutions To An Old Problem*, 32 Wm. and Mary L.Rev. 645, 647 (1991), the import of this ethical injunction, and others like it, is a clarion proclamation that "It's Never O.K." And yet, unfortunately, it occurs. According to Mr. James J. Homer, it occurred between the defendant, S. Eugene Long, M.D., and Mr. Homer's wife, Vicki Homer, and it led, ultimately, to the breakup of the Homer marriage. He seeks damages from Dr. Long for breach of contract, negligence, fraud, negligent misrepresentation, and intentional infliction of emotional distress.

---

1. See *Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry,* 1986, American Psychiatric Association, § 2, ¶ 2: "Sexual activity with a patient is unethical"; also § 1, ¶ 1: "The patient may place his/her trust in his/her psychiatrist knowing that the psychiatrist's ethics and professional responsibilities preclude him/her gratifying his/her own needs by exploiting the patient. This becomes particularly important because of the essentially private, highly personal, and sometimes intensely emotional nature of the relationship established with the psychiatrist." Similar proscriptions against sexual contacts between therapist and patient appear in the Hippocratic Oath and in the Codes of Ethics of the American Psychoanalytic Association, the American Psychological Association, the American Association for Counseling and Development, and the National Association of Social Workers. The American Medical Association has declared "sexual misconduct in the practice of medicine" to be unethical. *Principles of Medical Ethics and Current Opinions of the [American Medical Association] Council on Ethical and Judicial Affairs—1989,* § 8.14.

The Circuit Court for Howard County dismissed the tort claims in his complaint, believing that they were barred under the principles enunciated by this Court in *Gasper v. Lighthouse, Inc.,* 73 Md.App. 367, 533 A.2d 1358 (1987), *cert. denied,* 311 Md. 718, 537 A.2d 272 (1988). It kept alive the breach of contract claim but entered final judgment as to the tort claims under Md. Rule 2–602(b) so that this appeal could proceed. Mr. Homer contends that his tort claims are not barred under *Gasper* and that they are indeed permitted under the later decision of the Court of Appeals in *Figueiredo–Torres v. Nickel,* 321 Md. 642, 584 A.2d 69 (1991). We disagree.

### Underlying Facts

The case comes to us on the pleadings, and so we must take all well-pleaded allegations made by Mr. Homer as true.

The Homers were married in 1966; they have two children who, at the time of the relevant events here, were teenagers. In 1981, Ms. Homer began to suffer from depression which became more pronounced in 1985 following a series of particularly stressful events in her life. On October 25, 1985, she attempted to commit suicide and was taken to the emergency room at Howard County General Hospital. Mr. Homer, a veteran, arranged to have her transferred to Walter Reed Army Hospital as soon as a bed became available there but had her admitted in the meanwhile to the Howard County hospital. He decided to retain a psychiatrist to perform an initial evaluation and assist in the transfer, and he eventually selected Dr. Long, who had privileges at the local hospital. Dr. Long informed Mr. Homer that Ms. Homer would not receive appropriate treatment at Walter Reed and persuaded him to keep her at Howard County under Dr. Long's care. "In reliance upon Dr. Long's representation," Homer agreed that his wife would remain at the Howard County hospital, and he asked Dr. Long to provide "appropriate counseling and psychiatric treatment to Mrs. Homer."

Mr. Homer states that, during the seven weeks of his wife's hospitalization, he provided to Dr. Long, at the latter's request, a detailed written statement of events relating to Mr. Homer's and Ms. Homer's problems that contained "sensitive and confidential information." He also avers that, during that period of hospitalization, he and his daughters "were often precluded by Dr. Long from visiting Mrs. Homer" and that they were given little information about her status or treatment. In December, 1985, just before Ms. Homer's discharge, Dr. Long counseled Mr. Homer that his wife's "therapy required that she not return home immediately, but that she should live elsewhere." He therefore made arrangements for her to live with a cousin temporarily. Ms. Homer was discharged on December 9, and began then to receive outpatient treatment from Dr. Long. She returned home on January 15, 1986. In May, following a trip to Germany, Ms. Homer again attempted suicide and was readmitted to the Howard County hospital. How long she remained there is not clear.

At some point—according to Mr. Homer during the period that Dr. Long was treating Ms. Homer—Dr. Long "used the personal and confidential information that he had received from Mr. Homer to seduce Mrs. Homer and become sexually intimate with her, apparently as part of his treatment of Mrs. Homer." Homer asserts that his wife, at the time, was "dependent, needy, and vulnerable," and that Dr. Long prevented her from seeing her family "so that he could embark upon a course of treatment which included an exploitative sexual relationship with her," that he used the personal information supplied by Mr. Homer to "manipulate Mrs. Homer's feelings, positively toward Dr. Long, and negatively, toward Mr. Homer," and that he "effected and accomplished a 'transference' on the part of Mrs. Homer" pursuant to which she came to rely on him and to "perceive him as the most important person in her life." As "part of his plan to control Mrs. Homer," in May, 1986, Dr. Long employed her as a typist.

Between May and July, 1986, Ms. Homer's demeanor changed. She became deceptive, untruthful, nervous, and argumentative, and began to talk of divorce. On July 1, 1986, she moved out, renting an apartment near Dr. Long's office, but she returned in September and the Homers began marriage counseling. In October, however, she announced that she was hiring a divorce lawyer, and two months later she left the home again and filed for divorce. In January, 1987, she had her last therapy session with Dr. Long and began to see another psychiatrist, as, indeed, did Dr. Long. At that time, Dr. Long left his home as well. In August, 1989, Long's wife sued him for divorce; the following November, the Homers entered into a marital settlement agreement, intending it to be incorporated in an anticipated decree of divorce.

Mr. Homer contends that, although he did not discover the sexual relationship between his wife and Dr. Long until the spring of 1987, the evidence that he then had of it showed that it had been on-going since June, 1986. The gravamen of his complaint, as set forth in the concluding paragraph of his "Background" allegations, is that:

"In treating Mrs. Homer, Dr. Long wrongfully lulled Mr. Homer into believing that Dr. Long was providing his wife with appropriate psychiatric counseling, while Dr. Long, in fact, intended to and did embark upon a reprehensible and manipulative scheme to gain sexual access to Mrs. Homer, thereby destroying the Homer family unit, and causing Mr. Homer severe and permanent pain, suffering, mental anguish, and emotional distress, past, present, and future."

### Gasper and Figueiredo–Torres

In *Gasper v. Lighthouse, Inc., supra,* 73 Md.App. 367, 533 A.2d 1358, we observed that, under Maryland common law, a man had a recognized property interest in both his wife and his marriage. If he was cuckolded, he could sue the partner to his wife's adultery for the injury to his feelings and his honor. This action, though a civil one for

damages, was known as criminal conversation; the basis of it was the wife's adultery—the "defilement of the marriage bed." If the defendant induced a man's wife to leave or otherwise interfered with the marital relationship, whether or not any adultery occurred, the husband had an allied action for alienation of affections, not only for loss of consortium and injury to his feelings but, if the conduct was malicious, for punitive damages as well. We also pointed out that both of those common law actions had been abolished, the latter by the Legislature on policy grounds in 1945 and the former by the Court of Appeals, as violative of the State Equal Rights Amendment, in 1980.

Mr. and Mrs. Gasper had been referred to the corporate defendant for marriage counseling. In the course of that counseling by one of the defendant's counselors, the counselor commenced an adulterous relationship with Ms. Gasper that eventually led to a breakup of the Gaspers' marriage. Mr. Gasper sued for breach of contract, malicious breach of contract, breach of fiduciary duty, negligence, intentional infliction of emotional distress, and loss of consortium. The complaint was dismissed and we affirmed that dismissal, concluding that the actions as actually pled by Mr. Gasper were in reality transparent attempts to recover for criminal conversation and alienation of affections. We stated first, at 372, 533 A.2d 1358:

"As a preface to our consideration of the issues raised, we wish to make clear that abolition of the actions for alienation of affections and criminal conversation does not preclude a person from maintaining a traditional breach of contract action or a recognized tort action merely because the breach arose from an improper liaison with the plaintiff's spouse or because one effect of the alleged breach or tortious conduct was a disruption or breakup of his or her marriage.... What *is* precluded, however, is the refitting of the abolished actions into other forms. One cannot sue to recover for injuries arising from 'defilement of the marriage bed' or from an interference with the marriage by simply casting the

defendant's conduct as a breach of contract, or negligence, or some other intentional tort."

In examining Mr. Gasper's claims, we concluded that, in each instance, what he was attempting to do was to recover damages either for the adultery itself or for the breakup of his marriage. As to some of the claims, this was apparent from their substantive basis; as to others, it became clear from the nature of the damages sought.

*Figueiredo–Torres* also arose from a situation in which a husband and wife were undergoing marriage counseling, the defendant being a psychologist. During the therapy sessions, the defendant advised Mr. Figueiredo–Torres to distance himself from his wife, not to engage in any intimate contact with her, and ultimately to separate from her. At the same time, he commenced his own sexual relationship with her. Mr. Figueiredo–Torres sued the psychologist for negligence, gross negligence, intentional infliction of emotional distress, and "outrage." Unlike the result in *Gasper*, the Court of Appeals concluded that two of those claims as pled—professional negligence and intentional infliction of emotional distress—were cognizable and remanded them for trial.

The Court noted and indeed quoted from *Gasper*, but found it distinguishable. Although Mr. Figueiredo–Torres certainly complained about the adulterous relationship and its effect, that was not the sole basis of his action. He too was the defendant's patient, and the defendant's conduct was not only inappropriate as to the wife, but negligent as to him. As the Court stated at 650: "We doubt that the standard of care exercised by a reasonable psychologist permits the practitioner to treat a patient in the confines of the office and then undermine that treatment outside the therapy session." Continuing on 651, the Court concluded that, although on the surface the allegations of sexual misconduct may constitute criminal conversation, "if in addition, the sexual activity violated the professional standard of care which Nickel owed to [the plaintiff], it is sufficient to support a cause of action for professional negligence."

In that regard, the Court observed that, in addition to the "amatory claims," the plaintiff maintained that "Nickel demoralized him and engaged in conduct destructive to his ego development and self-respect in violation of the duty Nickel owed to his psychotherapy patient" and that the plaintiff himself suffered specific physical and psychological injury as a result. Similarly, with respect to the intentional tort, the Court concluded, at 657, that the gravamen of the claim "is not merely the sexual act or the alienation of his wife's affections. It is the entire course of conduct engaged in by his therapist, with whom he enjoyed a special relationship. This conduct constitutes more than the abolished amatory causes of action."

With this background, we turn to examine the specific actions pled by Mr. Homer, although not quite in the order presented in the complaint.

### Negligence (Count I)

In his negligence claim, Mr. Homer makes four basic averments: (1) that "[i]n promising to treat Mrs. Homer and accepting payment for the treatment by Mr. Homer, Dr. Long was under a duty to Mr. Homer in his care and treatment of Mrs. Homer, not to take advantage of either Mr. Homer or Mrs. Homer by virtue of his position as a psychiatrist"; (2) that he violated that duty and was negligent (i) in attempting to achieve improper purposes which he "knew or should have known were harmful to Mr. Homer," (ii) in coercing Mr. Homer to allow him to continue treating Ms. Homer and to provide confidential information so that Long could enter into a sexually intimate relationship with her, (iii) in counseling Ms. Homer to enter into that relationship, "to leave her home, and to divorce Mr. Homer as part of her treatment," and (iv) in certain of his other conduct alleged in the Background allegations; (3) that these acts of negligence were "gross, aggravated, reckless, and malicious"; and (4) that as a proximate result of that conduct, Mr. Homer "has suffered great mental anguish, reduction of his income, impairment of his emotion-

al and psychological health and well-being, financial expenses and losses, and has otherwise suffered and continues and will continue to suffer severe injury and damages."

This count suffers from two deficiencies, each of which is fatal to it. To recover in an action for negligence, the plaintiff must show, first, that the defendant owed a duty to him which was breached. That duty, moreover, must be one that the law is prepared to recognize. The duty claimed here is not to "take advantage of" either Mr. Homer or Ms. Homer by virtue of the defendant's position as a psychiatrist. That is a rather general statement, devoid of specifics. Unlike the situation in either *Gasper* or *Figueiredo–Torres*, Mr. Homer was never Dr. Long's patient, and so the normal duty that a doctor has to act in conformance with accepted standards of medical practice would not ordinarily flow to him. *Miller v. Schaefer,* 80 Md.App. 60, 559 A.2d 813 (1989), *aff'd,* 322 Md. 297, 587 A.2d 491 (1991); *Weaver v. Union Carbide Corp.,* 378 S.E.2d 105 (W.Va.1989); *Spiess v. Johnson,* 89 Or.App. 289, 748 P.2d 1020 (1988). *Compare Hoover v. Williamson,* 236 Md. 250, 203 A.2d 861 (1964), where a doctor retained by an employer to treat the employer's employees was held to have a duty of care to an employee whom he actually treated.

There are some limited circumstances in which a doctor or other therapist has been held to have a duty to persons other than his patient, mostly involving situations in which the patient has, or is thought to have, a communicable disease or otherwise presents a clear danger to a specific person. *See, in general,* 70 C.J.S. *Physicians and Surgeons* § 79, 87, 88, pp. 481, 493, 495; *DiMarco v. Lynch Homes—Chester County,* 384 Pa.Super. 463, 559 A.2d 530 (1989), *aff'd,* 525 Pa. 558, 583 A.2d 422 (1990); *Shepard v. Redford Community Hosp.,* 151 Mich.App. 242, 390 N.W.2d 239 (1986); *Molien v. Kaiser Foundation Hospitals,* 27 Cal.3d 916, 167 Cal.Rptr. 831, 616 P.2d 813 (1980); *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976); *compare Furr v. Spring Grove State Hosp.,* 53 Md.App. 474, 454 A.2d 414

(1983), *cert. denied,* 296 Md. 60; and *cf. Henley v. Prince George's County,* 305 Md. 320, 503 A.2d 1333 (1986). That is not the case here.

It would appear that the provision of individual psychotherapy to a married patient creates on its own a risk of conflict between the patient and his or her spouse, especially where the patient and the therapist are of different sexes. *See* R. Hafner, *Marriage and Mental Illness,* ch. 9, pp. 206–11. Imposing a duty of care in such situations flowing from the therapist to the spouse can not only exacerbate that risk but create some very serious additional problems, not the least of which may be that of a divided loyalty on the part of the therapist and the prospect of breaches of confidence that can undermine the therapy and work to the patient's disadvantage. The Court touched on this inferentially in *Figueiredo–Torres,* 321 Md. at 651, 584 A.2d 69, when it cautioned "that we do not espouse the notion that a psychologist who, acting in the best interest of his or her patient and using proper professional standards, advises the patient to separate from his or her spouse may be liable for professional negligence." We need not consider here whether, from a medical point of view, a therapist ought to give such advice directly; that is not our function. It is reasonable to suppose, however, that there will be situations in which such a separation (or some other course of action inimical to the interests of the patient's spouse) is nonetheless therapeutically advisable from the patient's point of view, and we cannot place the therapist in the position of being hesitant to make that recommendation or to refrain from dissuading the patient who, as a result of the therapy, makes that decision on his or her own, for fear of violating some duty owed to the spouse. In summary, aside from the special kinds of circumstances noted, a therapist's professional duty must run to his or her patient and not to the patient's spouse, even if, as here, the spouse is the one who initially employed the therapist and is paying the therapist's fees.

Apart from that problem, it seems evident from the damages claimed by Mr. Homer that, like Mr. Gasper, he is really seeking recompense for the breakup of his marriage and not for any personal injury to his body or psyche. He acknowledged at oral argument what seems apparent in any event from the complaint, that the monetary losses claimed—reduction of income and financial expenses and losses—arose from the divorce action and marital settlement between him and Ms. Homer rather than from any direct effect on him of Dr. Long's conduct with Ms. Homer, and that, likewise, the anguish of which he complains stems not from anything Dr. Long said or did to *him*, but from the breakup of his home and marriage. That puts him within the ambit of *Gasper* rather than *Figueiredo– Torres.*

### *Intentional Infliction of Distress (Count V)*

To recover in an action for intentional infliction of emotional distress, a plaintiff must show (1) conduct that is intentional or reckless; (2) conduct that is also extreme and outrageous; (3) a causal connection between the wrongful conduct and the emotional distress; and (4) that the emotional distress is severe. *Harris v. Jones,* 281 Md. 560, 566, 380 A.2d 611 (1977); *B.N. v. K.K.,* 312 Md. 135, 144, 538 A.2d 1175 (1988).

The conduct underlying Mr. Homer's claim under Count V is that described above. Mr. Homer alleged that it was intentional and reckless, and, despite a suggestion by Dr. Long that it may have been merely negligent, based on some theory of "cross-transference," we must accept the premise as pleaded by Mr. Homer. Whether, for purposes of this tort, the conduct is extreme and outrageous depends, at least in part, on the context in which it is viewed. Intrinsically, of course, it *is* extreme and outrageous; as noted, it violates clear standards set by the medical community itself. But the essence of the requirement is that the conduct must not simply be extreme and outrageous from the perspective of society at large, or from the perspective of someone else, but must be so as to the plaintiff. Out-

rageous conduct directed at A does not necessarily give B a cause of action.

There is no doubt that Dr. Long's conduct, as alleged, would be extreme and outrageous as to Ms. Homer, who, so far at least, has not chosen to complain of it. And, as *Figueiredo–Torres* makes clear, had Mr. Homer also been a patient of Dr. Long, it could be regarded as outrageous to him as well: "[A] jury may find extreme and outrageous conduct where a psychologist who is retained to improve a marital relationship implements a course of extreme conduct which is injurious to the patient and designed to facilitate a romantic, sexual relationship between the therapist and the patient's spouse." 321 Md. at 654, 584 A.2d 69. But that is not the case here.

There are situations in which conduct directed principally at one person has been regarded as extreme and outrageous as to another, but normally the other person must be present to witness the conduct in order to recover. *Restatement (Second) of Torts* § 46, which defines the tort in question, states, in subsection (2):

"Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

(a) to a member of such person's immediate family *who is present at the time, whether or not such distress results in bodily harm,* or

(b) to any other person *who is present at the time,* if such distress results in bodily harm."

(Emphasis added.)

Comment 1. explains the presence requirement:

"Where the extreme and outrageous conduct is directed at a third person, as where, for example, a husband is murdered in the presence of his wife, the actor may know that it is substantially certain, or at least highly probable, that it will cause severe emotional distress to the plaintiff. In such cases the rule of this Section applies. The cases thus far decided, however, have limited such liabili-

ty to plaintiffs who were present at the time, as distinguished from those who discover later what has occurred. The limitation may be justified by the practical necessity of drawing the line somewhere...."

Prosser and Keeton make the same point. In discussing acts directed at third persons (Prosser and Keeton, *The Law of Torts*, 5th ed., 1984, § 12, pp. 65–66), they note:

"Ordinarily recovery in such cases is limited to plaintiffs who are not only present at the time, but are known by the defendant to be present, so that the mental effect can reasonably be anticipated by the defendant. The distinction between the wife who sees her husband shot down before her eyes, and the one who hears about it five minutes later, may be a highly artificial one; but an argument in justification is the obvious necessity of drawing a line somewhere short of the widow who learns of the decease ten years afterward, when the genuineness and gravity of her distress may very reasonably be doubted."

The requirement of presence has been relaxed by some courts in particularly compelling circumstances, as, for example, where a parent sued the defendant for sexually molesting or kidnapping the plaintiff's child. *See Schurk v. Christensen*, 80 Wash.2d 652, 497 P.2d 937 (1972), relaxing the presence requirement in an action against a babysitter who abused the plaintiffs' child but invoking it in an action against the babysitter's parents; *Croft by Croft v. Wicker*, 737 P.2d 789 (Alaska 1987), allowing recovery where the parent was in close proximity to the event and observed the child's distress immediately after the incident. *See also Delia S. v. Torres*, 134 Cal.App.3d 471, 184 Cal.Rptr. 787 (1982), allowing a husband to recover against the defendant for raping the husband's wife outside husband's presence. But even in child molestation cases, the presence requirement has been applied. *H.L.O. by L.E.O. v. Hossle*, 381 N.W.2d 641 (Iowa 1986); *Lauver v. Cornelius*, 85 A.D.2d 866, 446 N.Y.S.2d 456 (1981); *Miller v. Cook*, 87 Mich.App. 6, 273 N.W.2d 567 (1978); *Gilbreath v. St. Paul Fire &*

*Marine Ins. Co.,* 141 Ariz. 92, 685 P.2d 729 (1984); *M.M. and M.M. v. M.P.S. and B.S.,* 556 So.2d 1140 (Fla.App.1989). And in a case close on point, the Supreme Court of Washington denied a husband recovery against a pastor who, outside the husband's presence, engaged in sexual contact with the plaintiff's wife while counseling her. *See Lund v. Caple,* 100 Wash.2d 739, 675 P.2d 226, 228–29 (1984):

> "The fatal flaw in appellant's outrage theory is that he was not present when the alleged outrageous conduct occurred, and did not even learn of it until several months later. Since appellant was not present, he has not established the tort of outrage. Such presence is a crucial element of a claim for outrage when the conduct is directed at a third person. Restatement, *supra* § 46(2)(a)."

We see no reason not to apply the general rule, for the pragmatic reason noted in the Restatement and by Prosser and Keeton. The emotional and economic trauma likely to arise from the seduction of one's spouse is not limited to the case where the seducer is the spouse's therapist. The conduct may be just as outrageous and the harm may be just as great where the seducer is a neighbor, a good friend, a relative, an employee or business associate of the plaintiff, or indeed anyone in whom the plaintiff has imposed trust or for whom he or she has special regard. To relax or abrogate the presence requirement in such cases would greatly expand the scope of the tort as framed and adopted by the Court of Appeals, which we are unwilling to do.

Apart from this, the count suffers from the same problem noted with respect to the negligence claim—the injuries alleged arise from the adultery and the ensuing breakup of the marriage, and are therefore precluded under *Gasper.*

### Negligent Misrepresentation (Count III) and Fraud (Count II)

Mr. Homer's actions for negligent misrepresentation and fraud are novel. We are cited to no authority, and have

found none, in which these kinds of claims have been made in this context.

■ The elements of the tort of negligent misrepresentation were enunciated in *Martens Chevrolet v. Seney,* 292 Md. 328, 337, 439 A.2d 534 (1982), as follows:

"(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his statement will be acted upon by the plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence."

*See also Weisman v. Connors,* 312 Md. 428, 540 A.2d 783 (1988).

■ In pleading his action for negligent misrepresentation, Mr. Homer incorporates all of the averments previously made in the complaint. The essence of his claim is that Dr. Long decided to enter into a sexual relationship with Ms. Homer at the outset (notwithstanding the later averment that that relationship did not commence until June, 1986, some eight months later), that he knew of Mr. Homer's intent to transfer her to Walter Reed Hospital, where Long would not have access to her, and that in an effort to prevent that transfer he carelessly represented to Mr. Homer that Ms. Homer would not get appropriate care at Walter Reed but would receive such care from him. He contends that, in reliance on these representations, he allowed Ms. Homer to remain at the Howard County hospital under Dr. Long's care, and that, as a result, he was injured.

Dr. Long defends this claim principally on the assertion that, as Mr. Homer was not his patient, he owed no duty of care to him, thereby negating the first element of the tort. We disagree.

The duty of care in this context is not the same as that involved in the negligence and intentional infliction of emotional distress cases. When Mr. Homer first took his wife to the Howard County hospital, she was in no position to arrange for her own medical care. It was Mr. Homer who made the initial decisions as to where his wife would be treated, and by whom. It was Mr. Homer, then, whom Dr. Long had to convince, and thus the duty not to misrepresent facts bearing on that decision necessarily flowed to Mr. Homer. Under the circumstances, as alleged, it was foreseeable and reasonable that Mr. Homer would rely on Dr. Long's statements in deciding upon his wife's treatment, and it was equally foreseeable that any misrepresentation as to the quality of care she would receive either at Walter Reed Hospital or at his hands, designed to give him the opportunity to form a sexual relationship with Ms. Homer, would cause damage to Mr. Homer. The elements of the tort, then, have been sufficiently pled.

The question remains, however, whether, despite a technically sufficient pleading of the tort, recovery is nonetheless barred under *Gasper* because, in the end, the real injury for which recovery is sought is either the adultery or the breakup of the marriage. Here, again, we look to the averments as to damage. In Count III itself, Mr. Homer simply says that he "has been severely injured *as aforesaid* as a direct, proximate and natural consequence of the negligent misrepresentations made by Dr. Long." (Emphasis added.) The most explicit articulation of Mr. Homer's damages came in Count II (Fraud), immediately preceding Count III. There, Mr. Homer claims that Long's conduct "resulted in tremendous and severe emotional damages to Mr. Homer, in great financial loss, in loss of income, in the loss of Mr. Homer's residence, and in the loss of Mr. Homer's career of choice." As we observed earlier, these losses accrued from the breakup of the Homer marriage and the consequent marital settlement agreement. As a result, the count fails under *Gasper.*

The fraud claim suffers the same fate, for the same reason. In contrast to the negligent misrepresentation count, Mr. Homer avers in Count II that Dr. Long knew that his representations were false or that they were made with reckless indifference to their truth or falsity, that they were made with the specific purpose of defrauding Mr. Homer, and that Dr. Long had no intention of keeping them. Assuming, *arguendo*, that these averments suffice to state an action for fraud, the damages sought relate entirely to disruption of the marriage.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.