865 A.2d 603

**James W. DEHN et ux.**

v.

**Glenn R. EDGECOMBE et al.**

**No. 117, Sept. Term, 2003.**

Court of Appeals of Maryland.

Jan. 14, 2005.

608

Larry N. Burch (Burch & Burch-Rates, LLC, Greenbelt, on brief), for petitioners.

Michelle R. Callender (Robert J. Farley, Wharton, Levin Ehrmantraut & Klein, P.A., Annapolis, on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and JOHN C. ELDRIDGE (Retired, specially assigned), JJ.

RAKER, J.

The principal question before this Court is whether Maryland recognizes an independent cause of action in a patient's wife against a doctor who acted negligently while treating her husband but who had no relationship or direct interaction with the wife. We shall hold that petitioners do not have an independent cause of action against respondents based upon respondents' alleged medical malpractice.

I.

On May 11, 2000, Corinne Dehn and James Dehn filed in the Circuit Court for Prince George's County a medical malpractice action against Glenn Edgecombe, M.D., *et al.*, alleging that Dr. Edgecombe was negligent in providing post-operative care following Mr. Dehn's vasectomy.

The case proceeded to trial before a jury. The court dismissed all of Mrs. Dehn's claims at the close of the plaintiffs' case. The jury returned a verdict in favor of Mr. Dehn on the issue of negligence, but in favor of Dr. Edgecombe on the issue of contributory negligence. The court entered judgment in favor of Dr. Edgecombe and the Dehns noted a timely appeal to the Court of Special Appeals. That court affirmed, 152 Md.App. 657, 834 A.2d 146 (2003), and we granted the Dehns's Petition for Writ of Certiorari. 379 Md. 224, 841 A.2d 339 (2004).

## A. Factual Background

We recount the facts as set out in the opinion of the Court of Special Appeals.

"At some time during 1994, when Mrs. Dehn was pregnant with the couple's second child, the Dehns decided not to have any more children. To that end, they decided that Mr. Dehn should undergo a vasectomy. Mr. Dehn discussed his desire with Dr. Edgecombe, his family practice doctor. Because Dr. Edgecombe was not qualified to perform a vasectomy, he referred Mr. Dehn to a surgeon, Dr. Samuel F. Mazella, who ultimately performed the vasectomy on October 24, 1995. There is no issue with respect to the referral to Dr. Mazella or with respect to the vasectomy itself.

Nor is there any issue with respect to the post-operative care, including post-operative advice, rendered by Dr. Mazella. Dr. Mazella expressly warned Mr. Dehn that the procedure might not be effective and that Mr. Dehn might still be able to father a child. To best insure against an unwanted pregnancy, Dr. Mazella instructed Mr. Dehn 1) that he was not to have unprotected sexual relations for six months and 2) that, during that time, he was to have at least twenty ejaculations. Dr. Mazella further provided Mr. Dehn with three prescriptions for semen analyses. He instructed Mr. Dehn to have the first semen analysis done after twenty ejaculations, and then to have the remaining two semen analyses completed at some time during the remainder of the initial six month period. The results of those tests were to be sent to Dr. Mazella's office. Only if and when the third analysis proved negative for sperm was the vasectomy to be considered to be a successful birth control measure. Dr. Mazella further expressly instructed Mr. Dehn to contact him, Dr. Mazella, if he had any concerns or problems during the post-operative period.

The evidence abundantly showed that Mr. Dehn negligently failed to follow Dr. Mazella's instructions. He never used the three prescriptions for semen analysis, because, he claimed, they were "vague" and they did not give him

specific directions as to a laboratory, a date, or a location for the sperm count test. Mr. Dehn acknowledged that one reason he did not follow instructions was because he speculated that his health plan would probably not pay for the tests. Obviously, no sperm test results were ever sent by Mr. Dehn to Dr. Mazella's office.

Mr. Dehn testified that he was not aware that three semen tests were required. At one point, he stated that he thought the tests were merely a "follow-up" after the passage of six months and twenty ejaculations, without pointing out the significance of that conclusion. Mr. Dehn acknowledged that, notwithstanding the instructions to contact Dr. Mazella about any questions or concerns, he never again contacted Dr. Mazella. Mr. and Mrs. Dehn engaged in unprotected sexual relations in December of 1996, at which time she conceived the child whose unwanted birth is the object of the present suit.

All of the controversy swirls about the nature of one or more conversations between Mr. Dehn and Dr. Edgecombe during the period between the performance of the vasectomy in October of 1995 and the onset of Mrs. Dehn's pregnancy in December of 1996. During that time, Mr. Dehn saw Dr. Edgecombe, his primary care provider, on at least several occasions for medical matters unrelated to the vasectomy.

Dr. Edgecombe testified that it was not until July 8, 1996, eight months after the vasectomy, that he even learned, in the course of a visit for an unrelated matter, that the vasectomy had, indeed, been performed on Mr. Dehn. He stated that it was standard practice for only the specialist surgeon who performed the operation to handle all aspects of post-operative care, including the monitoring of semen analyses. He testified that on a single occasion, the visit of July 8, 1996, Mr. Dehn raised with him the subject of a semen analysis and that the subject came up in a casual and offhand manner as they were leaving the office.

'I had seen Mr. Dehn for a medically related topic. We were done. We were leaving the room and he said, "Oh,

by the way, Doctor, I need a semen analysis." [It] was highly unusual. No patient has ever asked me that before. Again, we were not in the room, we were in the hall leaving.

'The patient said to me, "Dr. Mazella never asked or wanted to get a semen analysis." That was unusual, and I told Mr. Dehn that I [had] had a vasectomy in the past and my urologist had wanted to get a semen analysis at three months after the vasectomy or after 13 ejaculations. At that point it was almost nine months past the point where this would have routinely been done.

'I told Mr. Dehn also [that] it takes at least 13 ejaculations for the vas deferens, the sperm duct, to be emptied after a successful vasectomy. He told me that he had over twenty protected ejaculations. I also told Mr. Dehn in the hall that I had not heard of a vasectomy failing. Based on what he told me, that it was now six months after the fact when they are routinely done, and that he had twenty protected ejaculations, I'd assume that the surgeon had done the procedure correctly.

'He also seemed to indicate that the surgeon had discharged him a long time previously and, based on that, I said "I guess you don't need to have a semen analysis. It should have been done at three months." '

Dr. Edgecombe further testified that if Mr. Dehn had ever told him that he had not had a single semen analysis test and had not been discharged by Dr. Mazella, he would have sent Mr. Dehn back to Dr. Mazella. Dr. Edgecombe presented the expert opinion of Dr. Boyle, a family practitioner, that because of the referral of Mr. Dehn to Dr. Mazella, 1) there was no doctor-patient relationship between Dr. Edgecombe and Mr. Dehn as to the vasectomy and the postoperative care, 2) the patient had the responsibility to follow the instructions of the specialist, and 3) the referring physician could assume that such instructions were followed. Mr. Dehn, by way of stark contrast, testified that he had expressly asked Dr. Edgecombe for "a referral for a semen analysis" on three separate occasions. The first was on

May 24, 1996, when Mr. Dehn told Dr. Edgecombe that six months had passed since his vasectomy, that he had had twenty ejaculations, and that he needed a semen analysis to make certain that he was sterile. Dr. Edgecombe, however, reassured Mr. Dehn that there was no need for a semen analysis and that there was no risk of impregnating his wife. Mr. Dehn informed his wife about what Dr. Edgecombe had said, but she still wanted to wait for a semen analysis before engaging in unprotected sexual relations.

Accordingly, Mr. Dehn again raised the subject with Dr. Edgecombe on the occasion of his next medical appointment on July 9. He again asked Dr. Edgecombe for a referral for a semen analysis and was again told that there was no need for one. Mrs. Dehn, however, still insisted on waiting for a semen analysis before having unprotected sexual relations.

Mr. Dehn, according to his testimony, brought the subject up with Dr. Edgecombe on yet a third occasion on November 13, 1996. According to his testimony, Dr. Edgecombe replied:

> "Jimmy, personally I had a vasectomy seven years ago. I didn't have a sperm count done. Me and my wife [sic] have practiced regular relations. You're not going to get your wife pregnant. Will you go home, [and] tell your wife I personally assure her you cannot father any children."

Dr. Edgecombe, on the other hand, denied that he had even seen Mr. Dehn on November 13, for any reason."

152 Md.App. at 663–67, 834 A.2d at 149–151.

## B. The Trial

Prior to trial, Dr. Edgecombe moved *in limine*, seeking to exclude any reference to Mr. Dehn's pre-existing medical condition as it related to his reasons for seeking a vasectomy. The defendants also sought to exclude any reference to any purported conversation by Dr. Edgecombe suggesting that Mrs. Dehn had been impregnated by a man other than her husband. Counsel argued that the probative value of this

information was outweighed by the prejudicial effect it would have on the jury. In addition, defendants argued that there was no medical testimony that Mr. Dehn's life would be shortened for any reason. The trial court granted the motion, ruling that the decrease in life expectancy and related matters were not relevant, and more prejudicial than probative.

Trial commenced before a jury in July 2002 in the Circuit Court for Prince George's County. Petitioners' theory was that "the negligence in failing to provide a referral for semen analysis is the fault of Dr. Edgecombe, and the cost of raising this child should be borne by the party who was negligent." At the close of petitioners' case, Dr. Edgecombe moved for judgment in his favor. As we have indicated, the Circuit Court granted the motion with respect to Mrs. Dehn, dismissing all her claims, but allowed Mr. Dehn's claims to proceed. The jury found that: (a) Dr. Edgecombe was negligent by his failure to provide adequate post-operative care to Mr. Dehn following his vasectomy, and (b) Mr. Dehn was contributorily negligent by his failure to follow the instructions of Dr. Mazella who performed the vasectomy. Based on the jury finding of contributory negligence, the court entered judgment on behalf of Dr. Edgecombe.

Before the Court of Special Appeals, the Dehns argued that the Circuit Court's dismissal of Mrs. Dehn's claims against Dr. Edgecombe was legal error. The court disagreed with the Dehns and held that because Mrs. Dehn had never been a patient of Dr. Edgecombe, he did not owe her the duty of care arising out of a doctor-patient relationship. Thus, she could assert no cognizable claim of negligence against the doctor. The court rejected the argument that, even in the absence of a doctor-patient relationship, Dr. Edgecombe owed her a duty of care by virtue of her position as the spouse of Mr. Dehn. The court explained that any claims for damages Mrs. Dehn might have had in the absence of a doctor-patient relationship were "derivative" of her husband's claims, meaning that she could not raise an independent cause of action against the doctor, and that any viable claim she might have had was dependent on the successful recovery by Mr. Dehn on his "primary"

negligence action. As it happens, Mr. Dehn's claim of negligence was not viable because the jury found him to be contributorily negligent, which, in Maryland, is a complete bar to any recovery by a plaintiff. *See Harrison v. Montgomery County Bd. of Educ.*, 295 Md. 442, 456 A.2d 894 (1983). Under the holding of the Court of Special Appeals, Mrs. Dehn, like her husband, could recover no damages from Dr. Edgecombe.

The Dehns petitioned this Court for a Writ of Certiorari, presenting the following questions for our consideration:

"I. In negligent sterilization cases should the doctor-patient relationship be recognized to permit a duty between the doctor and patient's spouse when as a result of the negligent sterilization, the obvious and natural consequence of the malpractice would be that the wife will become pregnant and give birth? If so, would this cause of action be independent or derivative of the patient?

"II. Whether the trial court was properly able to exercise its discretion in forbidding the introduction of extremely probative and critical evidence related to the patient's genetic reason for the sterilization, when the trial judge: (1) failed to properly consider the use of this evidence as it pertains to the case of *Jones v. Malinowski*, [299 Md. 257, 473 A.2d 429 (1984)], and (2) misconstrued the proposition that the evidence was being offered for while intruding on the jury's province of determining the credibility of witnesses?

"III. Whether the trial judge erred by ruling that Mr. Dehn could not recover any nonpecuniary damages even though such damages are normally recoverable in negligence actions in Maryland?"

## II.

Petitioners argue in this Court that Mrs. Dehn should be permitted to bring an independent cause of action despite her lack of a doctor-patient relationship with Dr. Edgecombe. Petitioners rely primarily on the seminal case of *Jones v.*

*Malinowski,* 299 Md. 257, 473 A.2d 429 (1984), in which this Court held that the parents who conceived an unwanted but healthy child because of a doctor's negligently performed sterilization on the wife were permitted to receive damages for child-rearing costs, offset by the benefits the parents derived from the child's aid, society, and comfort. *Id.* at 270, 473 A.2d at 435. Although the Court's holding in that case did not speak to the precise issue here, petitioners base almost their entire argument on language in *Jones,* which refers to the recipients of the damages of child-rearing costs as the "parents," not as the single parent who underwent the negligent sterilization. They reason that because the *Jones* Court recognized that *both* parents suffer harm and costs resulting from that surgery, it is implicit in the holding that *each* parent has his or her own independent negligence action against the doctor. Petitioners also contend that an independent cause of action by the wife accrues because it is eminently foreseeable that a doctor's post-operative advice regarding a vasectomy to a husband could have serious effects on his wife.

Respondents' primary argument is that there was no error, and if there was, it was harmless. Respondents maintain that any error alleged by petitioners is not prejudicial because the jury found that Dr. Edgecombe was negligent. Petitioners cannot complain because the relevant part of the verdict was in their favor. On the substantive issue, respondents counter that the traditional rule in Maryland is that there can be no cause of action in negligence without there first being a duty on the part of the alleged tortfeasor. A duty, in turn, requires that there be a relationship between Dr. Edgecombe and Mrs. Dehn. No such relationship exists, and therefore there was no duty on the part of Dr. Edgecombe. Respondents disagree with the contention that the pregnancy effected by the doctor's negligent acts was foreseeable: Dr. Edgecombe was not the surgeon who performed the vasectomy, nor were his conversations with Mr. Dehn in the context of separate post-operative care for the vasectomy but rather for an entirely unrelated medical matter. Thus, those conversations, after which Mr. Dehn decided to forgo the semen analyses altogeth-

er, could not reasonably be deemed the foreseeable causes of the pregnancy of a person whom the doctor had never met.

## III.

The cause of action Mrs. Dehn wishes to bring against Dr. Edgecombe sounds in negligence.[1] Medical malpractice "is predicated upon the failure to exercise requisite medical skill and, being tortious in nature, general rules of negligence usually apply in determining liability." *Benson v. Mays*, 245 Md. 632, 636, 227 A.2d 220, 223 (1967). This understanding is not changed by the fact that the specific conduct constituting the medical malpractice at issue is negligent sterilization. As we explained in *Jones v. Malinowski*, negligence in the performance of a sterilization procedure is "a cause of action in tort based upon traditional medical malpractice principles." 299 Md. at 263, 473 A.2d at 432. We said that these "fundamental principles" of a tort action for negligence are "manifestly applicable to a medical malpractice action in Maryland involving . . . a suit by parents for money

---

1. In petitioners' complaint, as amended, Count I alleged negligence on the part of Dr. Edgecombe because he negligently failed to provide Mr. Dehn with a referral for a sperm count analysis after the performance of the vasectomy. Count II alleged negligence on the part of Dr. Samuel F. Mazella, the surgeon who performed the vasectomy, for failing to provide for a sperm count analysis after the performance of a vasectomy. Count III alleged wrongful pregnancy against Drs. Mazella and Edgecombe. Count IV alleged breach of contract. Count V alleged petitioners' loss of consortium. Counts VI and VII alleged vicarious liability of Carefirst of Maryland and Capital Care, respectively, two health maintenance organizations. Dr. Mazella and the health care providers, Carefirst and Capital Care, are not parties to this appeal.

An action for "wrongful pregnancy" has been defined as a "suit filed by a parent for proximate damages arising from the birth of a child subsequent to a doctor's failure to properly perform a sterilization procedure." *Johnson v. University Hosp. of Cleveland*, 44 Ohio St.3d 49, 540 N.E.2d 1370 (1989) (citing *Jones v. Malinowski*, 299 Md. 257, 473 A.2d 429 (1984)). Wrongful pregnancy actions typically involve a healthy child. *See Bruggeman v. Schimke*, 239 Kan. 245, 718 P.2d 635, 638 (1986). In Maryland, a wrongful pregnancy action is nothing more than an action in negligence and is decided properly by applying the same legal analysis employed in any medical negligence claim.

damages from a physician for the negligent performance of a sterilization operation." *Id.* at 269, 473 A.2d at 435. By treating a negligent sterilization case like any other negligence tort, we concluded that damages flowing from negligent sterilization should be assessed using traditional negligence principles. We held in *Jones* that there could be compensable injury to parents when a child is born as a result of medical negligence, and that the measure of damages included "child rearing costs to the age of the child's majority, offset by the benefits derived by the parents from the child's aid, society and comfort." *Id.* at 270, 473 A.2d at 435. Thus, Mrs. Dehn's claim of negligent sterilization, if there is one, is to be treated like any other medical malpractice tort, that is, as a traditional negligence claim. *Cf. Reed v. Campagnolo,* 332 Md. 226, 232, 630 A.2d 1145, 1148 (1993) (applying same "traditional medical malpractice principles for negligence" as in *Jones* to an action alleging so-called "wrongful birth," which alleges that the negligence of a physician deprived his patient of the opportunity to terminate a pregnancy that would likely result in a child born with severe birth defects).

In order to state a claim in negligence, the plaintiff must allege and prove facts demonstrating "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Horridge v. St. Mary's County Dept. of Social Services,* 382 Md. 170, 182, 854 A.2d 1232, 1238 (2004); *Green v. North Arundel Hospital,* 366 Md. 597, 607, 785 A.2d 361, 367 (2001). Our focus is on the first element, a legally cognizable duty owed by Dr. Edgecombe to Mrs. Dehn, for without a duty, no action in negligence will lie.

Duty, in negligence, is "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Prosser and Keeton on the Law of Torts,* § 53 at 356 (5th ed.1984). It is based upon a relationship between the actor and the injured person. The

issue of duty is one for the court as a matter of law. *See Hemmings v. Pelham Wood,* 375 Md. 522, 536, 826 A.2d 443, 451 (2003); *Valentine v. On Target,* 353 Md. 544, 551, 727 A.2d 947, 950 (1999).

It is the general rule that recovery for malpractice against a physician is allowed only where there is a relationship between the doctor and patient. *See, e.g., Eid v. Duke,* 373 Md. 2, 16, 816 A.2d 844, 852 (2003); *Dingle v. Belin,* 358 Md. 354, 367, 749 A.2d 157, 164 (2000); *Hoover v. Williamson,* 236 Md. 250, 253, 203 A.2d 861, 863 (1964); *Lemon v. Stewart,* 111 Md.App. 511, 521, 682 A.2d 1177, 1181 (1996). *See also* Rigelhaupt, *What Constitutes Physician–Patient Relationship for Malpractice Purposes,* 17 A.L.R.4th 132 (1982). This relationship may be established by contract, express or implied, although creation of the relationship does not require the formalities of a contract, and the fact that a physician does not deal directly with a patient does not necessarily preclude the existence of a physician-patient relationship. What is important, however, is that the relationship is a consensual one, and when no prior relationship exists, the physician must take some action to treat the person before the physician-patient relationship can be established.

There are exceptions to this rule. For example, when a physician undertakes to act gratuitously or in an emergency situation, a duty may be created, *see Hoover v. Williamson,* 236 Md. 250, 253, 203 A.2d 861, 863 (1964), but such exceptions are rare, particularly when the doctor never provided any treatment to the person alleging negligence. In *Homer v. Long,* 90 Md.App. 1, 599 A.2d 1193 (1992), a husband sued his wife's psychiatrist for damages resulting from the psychiatrist's affair with his wife, even though the husband was never a patient of the psychiatrist. The husband had retained the psychiatrist to treat his wife and to provide "appropriate counseling and psychiatric treatment" for her. He gave to the doctor "sensitive and confidential information" to aid in the treatment. The psychiatrist responded by using that information to commence a sexual relationship with the wife, which

led to the end of her marriage. The court held that the husband's negligence claim suffered from fatal deficiencies—primarily a failure to allege a duty that the law is prepared to recognize. *Id.* at 10, 599 A.2d at 1197. Judge Wilner, then Chief Judge of the Court of Special Appeals, and currently a judge on this Court, wrote for the panel that "the normal duty that a doctor has to act in conformance with accepted standards of medical practice" did not apply to the husband. *Id.* at 10, 599 A.2d at 1197.

In *Homer*, the court noted that some courts have recognized a duty of a physician to a non-patient in limited circumstances, such as when the patient has a communicable disease that puts another person at risk. *Id.* In *Lemon v. Stewart*, 111 Md.App. 511, 682 A.2d 1177 (1996), the plaintiffs sued the health care provider of a patient to whom they were related because the provider failed to inform them of the patient's HIV-positive test results. Judge Wilner, again for the Court of Special Appeals, reiterated the general rule that "[t]he common law duty of care owed by a health care provider to diagnose, evaluate, and treat its patient ordinarily flows only to the patient, not to third parties. Thus, it has often been said that a malpractice action lies only where a health care provider-patient relationship exists and there has been a breach of a professional duty owing to the patient." *Id.* at 521, 682 A.2d at 1181. The court held that under the circumstances presented, no duty existed on the part of the health care provider to disclose test results to the plaintiffs, noting that to impose such a duty was not only impractical but improper, based upon the public policy that the patient's privacy rights would be violated.

*Homer* and *Lemon* teach that although the common law does not foreclose the possibility of imposing a duty of care in the absence of a doctor-patient relationship to a third party who never received treatment from the doctor, it will not do so except under extraordinary circumstances. In *Homer*, the husband of the patient-wife not only hired the physician to treat his wife but also gave him confidential, personal information on their marriage. But even so, the Court of Special

Appeals was unable to discern a doctor-patient relationship sufficient to impose a medical malpractice duty of care on the psychiatrist with respect to the husband. *Homer,* 90 Md.App. at 10, 599 A.2d at 1197. In *Lemon,* even where there existed the potential for transmittal of a fatal virus, the court refused to impose a duty of care on the physicians to notify third parties, even relatives.

We turn to the threshold question in this case: whether there existed a duty flowing from Dr. Edgecombe to Mrs. Dehn, because if there was no duty, her negligence action will not lie. Mrs. Dehn alleges that a duty to her was breached when Dr. Edgecombe negligently failed to provide Mr. Dehn with the minimally acceptable level of medical care, by unreasonably refusing to provide a referral for a sperm count after the performance of a vasectomy, despite the requests of Mr. Dehn. We conclude there was no duty. Judge Moylan, writing for the panel in the Court of Special Appeals, pointed out the absence of any physician-patient relationship between Mrs. Dehn and the doctor, stating as follows:

"There was no direct doctor-patient relationship between Dr. Edgecombe and Mrs. Dehn. The two of them had never met or spoken to each other until the day of trial. Dr. Edgecombe was Mr. Dehn's primary health care provider, not Mrs. Dehn's. Mr. Dehn, not Mrs. Dehn, was in the health care program that involved Dr. Edgecombe. The evidence was, moreover, that on the three post-vasectomy occasions when Dr. Edgecombe was allegedly negligent, Mr. Dehn was not even visiting him to discuss post-operative care relating to the vasectomy but was visiting him, without Mrs. Dehn, for other and unrelated medical purposes. If a duty of care owed by Dr. Edgecombe to Mrs. Dehn is to be found, therefore, its source must be somewhere other than in a doctor-patient relationship *per se* between the two of them."

152 Md.App. at 681, 834 A.2d at 159–60.

Petitioners, however, would prefer that we circumvent the duty of care analysis altogether and simply rely on what they

consider to be the implicit holding of *Jones v. Malinowski.* Petitioners argue that the question of whether Mrs. Dehn has a cause of action against the doctor in her own right has been answered by our holding in *Jones,* which used language that indicated that the "parents," not the single parent who underwent the sterilization, were entitled to recover child-rearing costs. We disagree.

The question of whether a doctor owes a duty to a spouse of the patient, independent of the duty to the patient who underwent sterilization, was never presented to the Court in *Jones.* In that case, we granted certiorari to consider a single issue of first impression in this State, raised in the joint petition of the parties, namely: "Where a negligently performed sterilization resulted in the birth of a healthy child, did the trial court err in its charge that the jury could award damages for the expenses of raising the unplanned child during minority reduced by value of the benefits conferred upon the parents by having the child?" 299 Md. at 259, 473 A.2d at 430. There was no issue of a dismissed spouse as a party; nor was the issue of a duty by the physician to the spouse who did not undergo sterilization ever raised. In fact, disposition of that question would have made no difference in the case because there was no contributory negligence on the part of one of the parties, as in the case *sub judice.* In this regard, we completely agree with Judge Moylan's analysis in the Court of Special Appeals:

"In *Jones v. Malinowski,* to be sure, there were two plaintiffs, husband and wife. The wife suffered a flawed sterilization operation. The husband was indirectly involved as her spouse. In *Jones v. Malinowski,* however, the claim of neither plaintiff was, as here, dismissed from the suit. There was, moreover, no verdict, as in this case, of contributory negligence against one of the plaintiffs. There was, therefore, no issue in *Jones v. Malinowski* that involved any difference in the litigational postures of the respective plaintiffs. Their only role in that case was as an entity. It made no difference to the outcome of that case whether there was one proper plaintiff or two. Consequently, the Court did

not pay any attention to what was, in that context, a non-issue.

"Most assuredly, *Jones v. Malinowski* did not hold, as Mrs. Dehn now maintains, that in a suit for wrongful birth based on a doctor's negligence each parent has an independent right to sue the defendant-doctor regardless of whether that parent had ever been in a doctor-patient relationship with the defendant or not. If there was a duty of care owed by Dr. Edgecombe to Mrs. Dehn, its source must be sought by some modality other than attempting to read between the lines of *Jones v. Malinowski*. The only significance of the silence of *Jones v. Malinowski* is that although it did not affirm the existence of an extended duty of care to the patient's spouse, neither did it deny it. For the purposes of our present analysis, the question remained open."

152 Md.App. at 686, 834 A.2d at 162–63.

Petitioners raise several other arguments in favor of imposing such a duty. First, petitioners maintain that Dr. Edgecombe owed Mrs. Dehn a duty to act within the relevant standard of post-operative care for Mr. Dehn's vasectomy because, even though she was not a direct patient, it was foreseeable that negligence in the care of a vasectomy will result in the wife's pregnancy. Second, that the birth of a child has legal consequences for both parents, since both parents have a statutory and common law duty to provide for the needs of their children. *See* Md.Code (2004 Repl.Vol.), § 5–203(b) of the Family Law Article. Third, that where, as here, the negligent sterilization is a vasectomy on the husband, the physical consequences of a pregnancy, and of the physician's negligence, obviously are more serious for the wife than for the husband who was the patient.

██ First, mere foreseeability of harm or injury is insufficient to create a legally cognizable special relationship giving rise to a legal duty to prevent harm. We recently discussed the nature of duty and foreseeability in *Patton v. USA Rugby*, 381 Md. 627, 851 A.2d 566 (2004). Judge Harrell, writing for the Court, noted as follows:

"Where the failure to exercise due care creates risks of personal injury, 'the principal determinant of duty becomes foreseeability.' The foreseeability test 'is simply intended to reflect current societal standards with respect to an acceptable nexus between the negligent act and the ensuing harm.' In determining whether a duty exists, 'it is important to consider the policy reasons supporting a cause of action in negligence. The purpose is to discourage or encourage specific types of behavior by one party to the benefit of another party.' 'While foreseeability is often considered among the most important of these factors, its existence alone does not suffice to establish a duty under Maryland law.' "

*Id.* at 637, 851 A.2d at 571 (citations omitted). In *Ashburn v. Anne Arundel County,* 306 Md. 617, 510 A.2d 1078 (1986), we noted:

"However, 'foreseeability' must not be confused with 'duty.' The fact that a result may be foreseeable does not itself impose a duty in negligence terms. This principle is apparent in the acceptance by most jurisdictions and by this Court of the general rule that there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a 'special relationship' exists either between the actor and the third person or between the actor and the person injured."

*Id.* at 628, 510 A.2d at 1083 (1986).

As our cases have made clear, it is only in a limited number of cases where a special relationship sufficient to impose a duty of care will be found in the absence of traditional tort duty. *See Horridge v. St. Mary's County Dept. of Social Services,* 382 Md. 170, 854 A.2d 1232 (2004); *Remsburg v. Montgomery,* 376 Md. 568, 831 A.2d 18 (2003); *Muthukumarana v. Montgomery County,* 370 Md. 447, 805 A.2d 372 (2002). We believe this is not such a case.

In this case, petitioners do not maintain that there exists a statutory basis for imposing a duty, nor a contractual basis for imposing a duty. Instead, they maintain that there exists a

special relationship based on the foreseeability of injury to Mrs. Dehn.

We find petitioners' arguments unpersuasive. In a discussion of the limitations courts place upon an actor's responsibility for the consequences of the actor's conduct, Prosser & Keeton set out the principle as follows:

"As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.

"This limitation is to some extent associated with the nature and degree of the connection in fact between the defendant's acts and the events of which the plaintiff complains. Often to greater extent, however, the legal limitation on the scope of liability is associated with policy—with our more or less inadequately expressed ideas of what justice demands."

*Prosser and Keeton on the Law of Torts,* § 41 at 264 (5th ed.1984).

Whatever arguments might exist for extending the duty of care to a spouse in some other negligent sterilization case, the case *sub judice* is not the one for doing so. Dr. Edgecombe was not the physician who performed the vasectomy. Any reasonable reliance Mrs. Dehn might have placed in a doctor who *performed* the actual vasectomy on her husband is attenuated by the fact that Dr. Edgecombe did not perform the vasectomy and was caring for her husband on an unrelated matter when he made his alleged negligent statements. Moreover, not only was there no direct doctor-patient relationship as a result of a contract, express or implied, that Dr. Edgecombe would treat Mrs. Dehn with proper professional skill, but the two never even met each other until the day of trial, nearly seven years after the vasectomy. Dr. Edgecombe did not claim to be giving Mr. Dehn post-operative care; in fact, that care was explicitly undertaken by Dr. Mazella who

performed the vasectomy and whose instructions Mr. Dehn ignored.

Nor are we willing to impose a legal duty on Dr. Edgecombe with regard to Mrs. Dehn based simply on his alleged awareness that Mr. Dehn was married. A duty of care does not accrue purely by virtue of the marital status of the patient alone; some greater relational nexus between doctor and patient's spouse must be established, if it can be established at all, and here it was not. A duty of care to a non-patient is not one which Maryland law is prepared to recognize under these circumstances. The imposition of a common law duty upon Dr. Edgecombe to the wife under these circumstances could expand traditional tort concepts beyond manageable bounds. The rationale for extending the duty would apply to all potential sexual partners and expand the universe of potential plaintiffs. All of the above rationales for extending the duty of care apply with equal force to a non-spouse: Unmarried as well as married couples are bound by law to provide for their children, and the physical consequences of childbirth from a negligent vasectomy remain the same regardless of whether the mother is married or not. Based on these rationales alone, a family practitioner who ostensibly provides after-care following a sterilization procedure performed by another physician would owe a duty of care not just to the patient who underwent the operation but every sexual partner the patient encounters after the operation—a possibility the law does not countenance.

## IV.

Petitioners appeal from the evidentiary rulings pertaining to Mr. Dehn's peripheral artery disease; to separate referrals that Dr. Edgecombe gave to Mr. Dehn unrelated and several years prior to the vasectomy; and to Dr. Edgecombe's doubts about the paternity of Mrs. Dehn's child. Had these "key" pieces of evidence been admitted by the trial court, argue petitioners, the jury would not have found Mr. Dehn contributorily negligent. Thus, we are concerned here only with the

impact the evidence might have had on the jury's finding of contributory negligence.

The trial court rulings were based upon a finding that the prejudicial value of the evidence outweighed the probative effect. In making this determination, "[t]he admissibility of evidence, including rulings on its relevance, is left to the sound discretion of the trial court, and absent a showing of abuse of that discretion, its rulings will not be disturbed on appeal." *Farley v. Allstate Ins. Co.*, 355 Md. 34, 42, 733 A.2d 1014, 1018 (1999). When the trial court's evidentiary rulings result from its determination that the relevance of certain evidence is outweighed by its potential for prejudice, we review that determination for an abuse of discretion. *Bern–Shaw Limited Partnership v. Mayor & City Council of Baltimore*, 377 Md. 277, 291, 833 A.2d 502, 510 (2003). "Abuse of discretion" has been described aptly as follows:

> " 'Abuse of discretion' is one of those very general, amorphous terms that appellate courts use and apply with great frequency but which they have defined in many different ways.... [A] ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling. The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable. That kind of distance can arise in a number of ways, among which are that the ruling either does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective. That, we think, is included within the notion of 'untenable grounds,' 'violative of fact and logic,' and 'against the logic and effect of facts and inferences before the court.' "

*North v. North*, 102 Md.App. 1, 13–14, 648 A.2d 1025,1031–1032 (1994).

There was no such abuse here. The trial court's evidentiary rulings with respect to these three categories were not violative of fact or logic or beyond the fringe of what is

minimally acceptable. The trial court, whose "finger [is] on the pulse of the trial," *State v. Hawkins,* 326 Md. 270, 278, 604 A.2d 489, 493 (1992), had a sound basis to decide, for example, that the prejudicial value of evidence on Mr. Dehn's arterial disease outweighed any probative value it might have had; similarly, the trial court concluded, logically, that admitting evidence on Mr. Dehn's past referrals from Dr. Edgecombe regarding the arterial disease, not the vasectomy, was simply another, more oblique opening into admitting evidence about the disease itself and therefore was inconsistent with the ruling excluding evidence on the disease. Finally, it was well within the discretion of the court to determine that Dr. Edgecombe's erroneous statements made post-pregnancy regarding the paternity of Mrs. Dehn's child could be substantially prejudicial against him and, in any event, had little, if any, bearing on the contributory negligence of Mr. Dehn which occurred pre-pregnancy.

Petitioners' theories on how the exclusion of this evidence had an accumulated effect that would have negated the finding of Mr. Dehn's contributory negligence—which consisted, mainly, of Mr. Dehn's failure to adhere to Dr. Mazella's, not Dr. Edgecombe's, orders—only illustrate how very attenuated is the link of the evidence to Mr. Dehn's conduct. Indeed, we note that none of these theories, which argue that the excluded evidence would have shown that Mr. Dehn acted reasonably and non-negligently, were squarely presented to the trial court by petitioners' counsel who instead argued for admissibility on substantially different grounds.[2]

---

**2.** Petitioners argued in their opposition to respondents' motion *in limine* that Mr. Dehn's health and Dr. Edgecombe's statements about paternity were "essential elements of the *damages* caused to Plaintiffs in this case." Later, petitioners attempted to argue that the evidence on paternity should be allowed to rebut respondents' argument that the statute of limitations barred relief. Petitioners also argued that the treatment for the peripheral artery disease was "part and parcel" of the post-operative treatment of the vasectomy, serving to show that Dr. Edgecombe acted negligently and that "it's untrue that he would not have focused on the need for a semen analysis to prevent further children." The closest petitioners came to arguing this theory occurred

## V.

The final question presented for our review deals with the availability of nonpecuniary damages in this action. Because Mr. Dehn's recovery is barred by his contributory negligence, he is not entitled to any damages, whether pecuniary or nonpecuniary, and thus we do not address the question.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.   COSTS TO BE PAID BY PETITIONERS.*

Judge ELDRIDGE joins in the judgment only.

when petitioners' counsel attempted to elicit testimony on the peripheral artery disease to undermine the credibility of respondents' witnesses who, according to counsel, attempted to convince the jury on the disputed fact that there was only one occasion during which Dr. Edgecombe and Mr. Dehn discussed the need for a sperm analysis. Presumably, this information would have led the jury to believe Mr. Dehn that he met with the doctor three times to request the semen analysis, which would, in turn, lead to the conclusion that Mr. Dehn was non-negligent.   We agree with the trial court, especially since the negligent acts of Mr. Dehn occurred with respect to the instructions of Dr. Mazella and had nothing to do with the conversations with Dr. Edgecombe.