******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROBINSON, C. J., with whom McDONALD and KAHN, J., join, dissenting. I respectfully disagree with the majority's conclusion that Connecticut physicians, with respect to the diagnosis and reporting of their patients' sexually transmitted disease (STD) test results, owe a direct duty of care to "identifiable third parties who are engaged in an exclusive romantic relationship with a patient at the time of testing and, therefore, may foreseeably be exposed to any STD that a physician fails to diagnose or properly report." In my view, the majority's conclusion is inconsistent with our recent decision in *Jarmie* v. *Troncale*, 306 Conn. 578, 590–91, 50 A.3d 802 (2012), in which we deemed three principal considerations to be especially pertinent in determining what, if any, duty of care is owed by a medical professional to a nonpatient third party, specifically (1) Connecticut precedent, (2) the foreseeability of the alleged harm, and (3) public policy considerations. Following *Jarmie*, I conclude instead that the defendant physician, Charles Cochran, owed no duty to the plaintiff, Jane Doe, and that the trial court properly granted the defendant's motion to strike the plaintiff's single count complaint. Because I would affirm the judgment subsequently rendered by the trial court in favor of the defendant, I respectfully dissent.

I begin by noting my agreement with the majority's recitation of the factual and procedural history of the case. I also note my substantial agreement with the majority's analysis in part I of its opinion, including the standard of review and the treatment of the plaintiff's single count complaint as having alleged both medical malpractice and common-law negligence, similar to our treatment of the action in *Jarmie*.[1] Id., 583–86. I part ways with the majority at part II of its opinion.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. . . . Contained within the first element, duty, there are two distinct considerations. . . . First, it is necessary to determine the existence of a duty, and then, if one is found, it is necessary to evaluate the scope of that duty. . . . The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand. . . . If a court determines, as a matter of law, that a defendant owes no duty to a plaintiff, the plaintiff cannot recover in negligence from the defendant. . . .

"Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of the duty, and the specific persons to whom it is owed, are deter-

mined by the circumstances surrounding the conduct of the individual. . . . Although it has been said that no universal test for [duty] ever has been formulated . . . our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised. . . . By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result . . . .

"A simple conclusion that the harm to the plaintiff was foreseeable, however, cannot by itself mandate a determination that a legal duty exists. Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed. . . . A further inquiry must be made, for we recognize that duty is not sacrosanct in itself . . . but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection. . . . The final step in the duty inquiry, then, is to make a determination of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results." (Internal quotation marks omitted.) Id., 589–90.

In *Jarmie*, we considered whether to recognize a duty of care owed by a physician to a third party nonpatient. In that case, a patient crashed her vehicle into the plaintiff after blacking out while driving. Id., 580. The plaintiff in *Jarmie* claimed that the defendant, a physician, had breached a duty to warn the patient of the risks of a latent driving impairment associated with a particular medical condition. Id. In concluding that the physician did not owe a duty of care to a third party nonpatient, this court considered three principal factors: (1) Connecticut precedent, (2) foreseeability, and (3) public policy considerations, including the decisions of courts in other jurisdictions. Id., 589–91.

We began in *Jarmie* by analyzing Connecticut precedent, and observed that it "is useful to view Connecticut common-law rules defining the duty of health care providers in conjunction with [General Statutes] § 52-190a, the medical malpractice statute, because all of the relevant case law followed enactment of that provision. The statute had several purposes, including: (1) to put some measure of control on what was perceived as a crisis in medical malpractice insurance rates; (2) to discourage frivolous or baseless medical malpractice actions; (3) to reduce the incentive to health care providers to practice unnecessary and costly defensive medicine because of the fear of such actions; (4) to

reduce the emotional, reputational and professional toll imposed on health care providers who are made the targets of baseless medical malpractice actions; and (5) the replacement of proportional liability for the preexisting system of joint and several liability as a central part of [tort reform], so as to remove the health care provider as an unduly attractive deep pocket for the collection of all of the plaintiff's damages. . . . Thus, a principal goal of § 52-190a, and of tort reform generally, was to limit the potential liability of health care providers. . . .

"The common law, reflecting the goals of the tort reform movement and the legislature's purpose in enacting § 52-190a, likewise disfavors the imposition of liability on health care providers. The established rule is that, absent a special relationship of custody or control, there is no duty to protect a third person from the conduct of another. . . . Thus, physicians owe an ordinary duty to their patients not to harm them through negligent conduct and an affirmative duty to help them by providing appropriate care. . . . There is no well established common-law rule that a physician owes a duty to warn or advise a patient for the benefit of another person." (Citations omitted; internal quotation marks omitted.) Id., 591–92.

"Consistent with the purpose of the medical malpractice statute and the limited duty of health care providers under the common law, this court has exercised restraint when presented with opportunities to extend the duty of health care providers to persons who are not their patients. As a consequence, we have held that a nurse and an emergency medical technician owed no duty of care to a patient's sister, who fainted while observing a medical procedure performed on the patient; *Murillo* v. *Seymour Ambulance Assn., Inc.,* [264 Conn. 474, 477–78, 823 A.2d 1202 (2003)]; a psychiatrist owed no duty to a patient's former spouse for any direct injury to the marriage caused by the allegedly negligent treatment of the patient for marital difficulties; see *Jacoby* v. *Brinckerhoff,* 250 Conn. 86, 88, 95–98, 735 A.2d 347 (1999); a psychiatrist who evaluated children for possible sexual abuse owed no duty of reasonable care to protect the children's father, the suspected abuser, from false accusations of abuse arising out of the performance of the evaluations; *Zamstein* v. *Marvasti,* 240 Conn. 549, 550–51, 559–61, 692 A.2d 781 (1997); and a physician owed no duty of care to his patient's daughter, who suffered emotional distress as a result of observing the patient's health deteriorate because of the physician's malpractice. *Maloney* v. *Conroy,* 208 Conn. 392, 393, 403, 545 A.2d 1059 (1988). The only time that we have even contemplated enlarging the duty of a health care provider to include a person who is not a patient was when we considered whether a psychotherapist owed a duty to a third party to control an outpatient who was not known to have been danger-

ous. See *Fraser* v. *United States*, [236 Conn. 625, 627–30, 674 A.2d 811 (1996)]. In that case, we determined that no duty existed in the absence of a showing that the victim was either individually identifiable or, possibly, was either a member of a class of identifiable victims or within the zone of risk to an identifiable victim. Id., 634. Accordingly, although there is no directly comparable Connecticut case law on which to rely, our precedent, in general, does not support extending the duty of care . . . because, with one limited exception that does not apply . . . we repeatedly have declined, in a variety of situations, to extend the duty of health care providers to persons who are not their patients." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Jarmie* v. *Troncale*, supra, 306 Conn. 592–93.

Although the precise factual circumstances of this case present an issue of first impression, I conclude that Connecticut precedent, as explained in *Jarmie*, demonstrates this court's consistent reluctance to extend the legal duties of medical professionals to nonpatient third parties. Indeed, no Connecticut case decided after *Jarmie* has disturbed the soundness of that assessment.[2] Therefore, Connecticut precedent militates against recognizing a legal duty in the present case.

Consistent with *Jarmie*, I next consider a classic duty analysis focused on the foreseeability of the alleged harm. Id., 594–98. I agree with the majority's observation that *Jarmie* left open the possibility that a duty may exist in a case where the victim is identifiable, and I also agree with the majority that, construing the complaint in the present case in a light most favorable to sustaining its sufficiency, the plaintiff was identifiable.[3] Whereas the plaintiff in *Jarmie* was neither an identifiable victim nor a member of an identifiable class of victims as a general motorist who might come in close proximity to a vehicle operated by the patient following her diagnosis; id., 597–98; the patient in the present case explained to the defendant that he had sought STD testing for the benefit of his new, exclusive girlfriend, the plaintiff, thus making her identifiable to the defendant. Our analysis in *Jarmie* did not, however, hinge solely on the issue of foreseeability. We noted that "[a] simple conclusion that the harm to the plaintiff was foreseeable . . . cannot by itself mandate a determination that a legal duty exists." (Internal quotation marks omitted.) Id., 590. Considerations of foreseeability must be tempered by the reluctance in Connecticut precedent to extend the duties of health care providers to nonpatient third parties and the weight of public policy considerations, which militate against recognizing a duty in the present case.

Our final consideration in *Jarmie* was whether public policy considerations favored or disfavored recognition of a duty. In addressing public policy concerns, we

considered the purposes of tort compensation and "four specific factors to be considered in determining the extent of a legal duty as a matter of public policy. . . . (1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions."[4] (Internal quotation marks omitted.) Id., 603.

"[T]he fundamental policy purposes of the tort compensation system [are] compensation of innocent parties, shifting the loss to responsible parties or distributing it among appropriate entities, and deterrence of wrongful conduct . . . . It is sometimes said that compensation for losses is the primary function of tort law . . . [but it] is perhaps more accurate to describe the primary function as one of determining when compensation [is] required. . . . An equally compelling function of the tort system is the prophylactic factor of preventing future harm . . . . The courts are concerned not only with compensation of the victim, but with admonition of the wrongdoer. . . . [I]mposing liability for consequential damages often creates significant risks of affecting conduct in ways that are undesirable as a matter of policy. Before imposing such liability, it is incumbent upon us to consider those risks." (Citations omitted; internal quotation marks omitted.) Id., 599–600.

With regard to the compensation of innocent parties, individuals like the plaintiff in the present case may well be covered by public or private health insurance policies, so it is not necessarily the case that the plaintiff, or others in her position, will be left without compensation. Additionally, as we observed in *Jarmie*, "to the extent an injured party may not be covered by a . . . health insurance policy, the financial cost to victims . . . does not necessarily outweigh the impact of the proposed duty on thousands of physician-patient relationships across the state and the potentially high costs associated with increased litigation . . . ." Id., 601. As for the deterrence of wrongful conduct, if, as the majority concludes, the duty owed to the plaintiff is the same duty owed to the patient—namely, the accurate reporting of STD testing results—then "expanding the liability of health care providers would not reduce the potential for harm because health care providers would be required to do no more than they already must do to fulfill their duty to patients." Id., 601–602. Finally, the same concerns we voiced in *Jarmie* concerning interference with the physician-patient relationship and an increase in litigation are present in this case, and are discussed more fully subsequently in this dissenting opinion.

I now move to the four specific factors discussed in *Jarmie*. "Starting with the expectations of the parties,

long established common-law principles hold that physicians owe a duty to their patients because of their special relationship, not to third persons with whom they have no relationship. Furthermore, there is no state statute or regulation that imposes a duty on health care providers to warn a patient for the benefit of the public." Id., 603–604. It is unlikely that a person harmed in the manner that this plaintiff was harmed would expect to be compensated by the physician, with whom he or she has no special relationship, in light of the privileged status of the physician-patient relationship and the common-law protections granted to physicians. Consequently, the normal expectations of the parties weigh against recognition of a duty in the present case, as they did in *Jarmie*.

Turning to the public policy of encouraging participation in the activity under review, recognizing a duty of care under the circumstances of this case "would be inconsistent with the physician's duty of loyalty to the patient, would threaten the inherent confidentiality of the physician-patient relationship and would impermissibly intrude on the physician's professional judgment regarding treatment and care of the patient." Id., 606. Indeed, "[u]nlike most duties, the physician's duty to the patient is explicitly relational: physicians owe a duty of care to *patients*. . . . Mindful of this principle, we have recognized on more than one occasion the physician's duty of undivided loyalty to the patient . . . and the patient's corresponding loyalty, trust and dependence on the professional opinions and advice of the physician. . . . Undivided loyalty means that the patient's well-being must be of paramount importance in the mind of the physician. Indeed, this is the foundation for the patient's reciprocal loyalty, trust and dependence on the physician's medical treatment and advice. Consistent with this view, we have stated that, [a]s a matter of public policy . . . the law should encourage medical care providers . . . to devote their efforts to their patients . . . and not be obligated to divert their attention to the possible consequences to [third parties] of medical treatment of the patient. . . . It is . . . the consequences to the patient, and not to other persons, of deviations from the appropriate standard of medical care that should be the central concern of medical practitioners. . . .

"Extending a health care provider's duty also would threaten the confidentiality inherent in the physician-patient relationship because lawsuits alleging a breach of the duty would compel the use of confidential patient records by defending physicians. The principle of confidentiality lies at the heart of the physician-patient relationship and has been recognized by our legislature. General Statutes § 52-146o was enacted in 1990; see Public Acts 1990, No. 90-177; to address the need to protect the confidentiality of communications in order to foster the free exchange of information from patient

to physician . . . . The statute provides that a health care provider shall not disclose patient information in their files without the patient's explicit consent. See General Statutes § 52-146o (a). Thus, when a patient decides to bring a claim against a health care provider, the patient makes a purposeful decision to waive confidentiality. . . . Subsection (b) (2) of § 52-146o, however, contains an exception whereby patient consent is not required for the disclosure of communications or records by a health care provider against whom a claim has been made. Consequently, if [an injured third party] files an action against the health care provider of [a patient], records containing the patient's medical history will very likely be disclosed in court and subjected to public scrutiny. The effect of expanding the duty of a health care provider in this fashion cannot be underestimated. Physician-patient confidentiality is described as a privilege . . . . When that confidentiality is diminished to any degree, it necessarily affects the ability of the parties to communicate, which in turn affects the ability of the physician to render proper medical care and advice. Accordingly, it is not in the public interest to extend the duty of health care providers to third persons in the present context because doing so would jeopardize the confidentiality of the physician-patient relationship."[5] (Citations omitted; emphasis altered; footnote omitted; internal quotation marks omitted.) *Jarmie* v. *Troncale*, supra, 306 Conn. 606–609.

Connecticut state law reflects additional patient confidentiality concerns that militate against the recognition of a duty in the present case. State law demonstrates the overarching primacy of patient confidentiality, even in this context of infectious disease.[6] Connecticut has a communicable disease reporting system and a list of specific diseases and conditions that physicians are required to report to public health officials. See Regs., Conn. State Agencies § 19a-36-A2 (requiring Commissioner of Public Health to issue list of reportable diseases); see also Connecticut Department of Public Health, "Reportable Diseases, Emergency Illnesses and Health Conditions, and Reportable Laboratory Findings Changes for 2019," 39 Conn. Epidemiologist 1 (2019) (list of reportable diseases). The reporting is made by physicians to the public health authority, but it is government officials who may act on the information and intervene with any third parties, not the reporting physician. See General Statutes. § 19a-215 (d). Put differently, the physician has no statutory duty vis-à-vis any third party beyond merely reporting the disease or condition to the appropriate authority.

Another instructive example of the legislature's concern for confidentiality can be seen in Connecticut's HIV laws, upon which the majority relies for the proposition that physicians' public health obligations may transcend their duties to individual patients, observing that the

state "permit[s] physicians to warn, or to disclose confidential patient information for the purpose of warning, a known partner of a patient who has been diagnosed with an HIV infection or related disease." The HIV statute is protective of confidentiality insofar as it does not permit a physician to directly inform a sexual partner about a patient's HIV test results under circumstances similar to this case. See General Statutes § 19a-584 (b) (physician may only directly inform known partner if both partner and patient are under physician's care or if patient has requested it). Although the majority's opinion does not impose a duty to warn on physicians under the circumstances of this case, the overarching emphasis placed on confidentiality by the legislature, including the legislature's decision not to impose further statutory duties on physicians to warn under similar circumstances, coupled with the threat that confidential records may be disclosed in litigation without the patient's consent, suggest that imposition of a duty under the circumstances of this case is incongruous with the legislature's repeated emphasis on patient confidentiality. Put plainly, recognizing a duty under the circumstances of this case endangers participation in the activity under review because it interferes with physicians' duty of loyalty to their patients and threatens the sanctity of physician-patient confidentiality.

Moving to the avoidance of the increased risk of litigation, the Department of Public Health has published STD reporting statistics for 2015 that indicate approximately 13,269 reported cases of Chlamydia, 2,092 reported cases of Gonorrhea, and 99 reported cases of Syphilis that year. Connecticut Department of Public Health, "Chlamydia, Gonorrhea, and Primary and Secondary Syphilis Cases Reported by Town," (2015), available at https://portal.ct.gov/-/media/Departments-and-Agencies/DPH/dph/infectious_diseases/std/Table12015pdf (last visited July 11, 2019). Assuming that each of those individuals was in an exclusive sexual relationship, there would have been 15,460 additional individuals to whom physicians may have owed a duty under the majority's opinion in the present case. This increase in the risk of litigation threatens more than just the pocketbooks of physicians and their insurers; it threatens patient care. A likely consequence of this expansion of liability is that physicians will be reticent to discuss their patients' romantic relationships or sexual behavior in an attempt to avoid identifying third parties to whom the physician could be liable, despite such an approach not necessarily being in the patient's best interests. This reaction, referred to as "defensive medicine" in medical literature, involves physicians altering treatment and advice as part of an effort to avoid liability, and it is considered to have very negative and costly effects on the provision of health care. See J. Greenberg & J. Green, "Over-testing: Why More Is Not Better," 127 Am. J. Med. 362, 362–63 (2014); M.

Mello et al., "National Costs of the Medical Liability System," 29 Health Aff. 1569, 1572 (2010); see also B. Nahed et al., "Malpractice Liability and Defensive Medicine: A National Survey of Neurosurgeons," (2012), p. 4, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3382203/pdf/pone.0039237.pdf (last visited July 11, 2019).

An additional concern is the effect that an expansion of the potential liability of physicians is likely to have on malpractice insurance rates. Connecticut health care professionals cannot obtain a license to practice medicine without showing that they have adequate malpractice insurance. See General Statutes § 20-11b (a). If insurance premiums for physicians increase to an unaffordable level, physicians may leave the practice of medicine or, at the least, stop offering the services that instigate such high premiums. An instructive example of this concern is the early 2000s crisis in the field of obstetrics. "Soaring malpractice insurance costs led to the closings of trauma and maternity wards across the country [and] forced many obstetricians to give up obstetrics, restrict services, deny certain high-risk patients, become consultants, relocate, retire early, or abandon their practices all together." (Footnote omitted.) S. Domin, "Where Have All the Baby-Doctors Gone? Women's Access to Healthcare in Jeopardy: Obstetrics and the Medical Malpractice Insurance Crisis," 53 Cath. U. L. Rev. 499, 499–500 (2004). The threat of something similar happening in Connecticut requires that we exercise caution, particularly in an area where the potential consequences are such that the legislature is in a better position to address these concerns than our courts are.

Indeed, this is an issue on which the legislature has previously acted. As we observed in *Jarmie*, part of the impetus behind the enactment of our medical malpractice statute, § 52-190a, was "to put some measure of control on what was perceived as a crisis in medical malpractice insurance rates." (Internal quotation marks omitted.) *Jarmie* v. *Troncale*, supra, 306 Conn. 591. One such measure of control, the requirement that an opinion letter issued by a similar health care provider be attached to a medical negligence complaint, was suggested by the General Assembly's Legislative Program Review and Investigations Committee after it conducted hearings following a significant increase in medical malpractice insurance rates in the early 2000s. See Legislative Program Review and Investigations Committee, Connecticut General Assembly, Medical Malpractice Insurance Rates (December 2003). Because the majority's opinion recognizes a duty to potentially thousands of new plaintiffs, which is very likely to have an impact on medical malpractice rates, this court should not throw caution to the wind and take such action when the legislature is in a much better position to investigate the issue, and make findings and recom-

mendations on the subject, as it has done in similar circumstances.

Given that the legislature has acted extensively in the areas of both STD reporting and to provide physicians relief from professional liability, I am hesitant to usurp its "primary responsibility for formulating public policy" by recognizing a new duty to third party nonpatients. (Internal quotation marks omitted.) *Mayer* v. *Historic District Commission*, 325 Conn. 765, 780, 160 A.3d 333 (2017). Indeed, in *Sic* v. *Nunan*, 307 Conn. 399, 410, 54 A.3d 553 (2012), this court recognized that primary responsibility for public policy in declining to impose a duty on motorists stopped at an intersection to keep their wheels pointed straight, emphasizing that the legislature had "not seen fit to enact any statutes" in that respect. Thus, I disagree with the majority's decision to adopt a duty in the present case that will expand the pool of potential litigants, increase the risk of litigation, and threaten access to and the quality of patient care in this state—in contravention of legislative action on point.

Finally, turning to decisions of other jurisdictions, I note that there is no clear trend in our sister courts that supports usurping the legislature's responsibility for public policy and creating the duty that the majority recognizes in the present case. To be sure, there is case law that supports the decision of the majority. See *Reisner* v. *Regents of the University of California*, 31 Cal. App. 4th 1195, 1197–201, 37 Cal. Rptr. 2d 518 (1995) (physician owed duty to unknown and unidentifiable sexual partner of patient to warn patient or her parents of patient's HIV positive status), review denied, California Supreme Court, Docket No. S045274 (May 18, 1995); *C.W.* v. *Cooper Health System*, 388 N.J. Super. 42, 58–62, 906 A.2d 440 (App. Div. 2006) (hospital and its physicians owed direct duty to unknown and unidentifiable sexual partner of patient to warn patient of patient's HIV positive status); *DiMarco* v. *Lynch Homes-Chester County, Inc.*, 525 Pa. 558, 563–64, 583 A.2d 422 (1990) (physicians owed duty to sexual partner of patient with hepatitis not to give erroneous advice to patient because class of foreseeable victims included anyone who was intimate with patient);[7] *Estate of Amos* v. *Vanderbilt University*, 62 S.W.3d 133, 138 (Tenn. 2001) (university medical center owed duty to future husband and future daughter of HIV positive patient to warn patient so she might take precautionary measures preventing transmission of HIV because future husband and future daughter were within class of identifiable persons within zone of danger). I find, however, that sister state cases declining to recognize a third party duty for physicians are more consistent with our state's public policy and precedent. See, e.g., *Hawkins* v. *Pizarro*, 713 So. 2d 1036, 1037–38 (Fla. App.) (physician owed no duty to future spouse of patient when physician improperly advised patient she tested negative for hepatitis C),

review denied, 728 So. 2d 202 (Fla. 1998); *Dehn* v. *Edgecombe*, 384 Md. 606, 622, 865 A.2d 603 (2005) (physician owed no duty to wife of patient when physician negligently failed to provide patient with minimally acceptable medical care in connection with a vasectomy); *Herrgesell* v. *Genesee Hospital*, 45 App. Div. 3d 1488, 1490, 846 N.Y.S.2d 523 (2007) (physician owed no duty to daughter of patient when daughter contracted hepatitis B from patient because physician does not owe duty to nonpatient who contracts illness from patient, even if physician knows nonpatient cares for patient or is family member of patient); *Candelario* v. *Teperman*, 15 App. Div. 3d 204, 204–205, 789 N.Y.S.2d 133 (2005) (physician owed no duty to daughter of patient when daughter contracted hepatitis C, even though physician was aware daughter was caring for patient); *D'Amico* v. *Delliquadri*, 114 Ohio App. 3d 579, 581–83, 683 N.E.2d 814 (1996) (physician owed no duty to girlfriend of patient when girlfriend contracted genital warts from patient after defendant cared for and treated patient). Consequently, the decisions of our sister courts demonstrate no clear trend on the broader recognition and extent of physicians' third party duties, let alone the specific duty that the majority recognizes in the present case.[8]

Accordingly, I conclude, consistent with *Jarmie* v. *Troncale*, supra, 306 Conn. 578, that the defendant did not owe the plaintiff, who was not his patient, a duty of care in the present case. Given the potential ramifications of recognizing such an expanded duty of care, I would leave that potential expansion of liability to the legislature—which is better equipped than this court to make the public policy findings attendant to that expansion of liability.[9] See, e.g., *State* v. *Lockhart*, 298 Conn. 537, 574–75, 4 A.3d 1176 (2010) (declining to require recording of custodial interrogations and deferring to legislature because "it is in a better position to evaluate the competing policy interests at play in developing a recording requirement in that it can invite comment from law enforcement agencies, prosecutors and defense attorneys regarding the relevant policy considerations and the practical challenges of implementing a recording mandate"). Accordingly, I conclude that the trial court properly granted the defendant's motion to strike.

Because I would affirm the judgment of the trial court, I respectfully dissent.

[1] I agree with the majority's observation in footnote 3 of its opinion that "the plaintiff's allegations may fit most neatly under the rubric of negligent misrepresentation. Because neither party has addressed the issue, however, we need not determine whether the allegations in the complaint are legally sufficient to plead a cause of action in negligent misrepresentation under the law of this state." I nevertheless respectfully disagree with part II B 1 of its opinion, in which the majority discusses principles of negligent misrepresentation at length in combining them with other tort law principles, in order to create a duty of care that we have not previously recognized in this state. Because I do not agree that principles of negligent misrepresentation support recognizing a direct duty of care owed by physicians to nonpatients,

I respectfully disagree with this portion of part II B 1 of the majority's opinion.

[2] The majority relies on *Squeo* v. *Norwalk Hospital Assn.*, 316 Conn. 558, 113 A.3d 932 (2015), to bolster its argument that Connecticut precedent is "unsettled with respect to the particular question presented here." That case is, however, distinguishable. In *Squeo*, a case involving a bystander emotional distress claim and medical malpractice, and not ordinary negligence, we only cited to *Jarmie* to note that our rejection of a bar on a cause of action for bystander emotional distress in the context of medical malpractice was consistent with our rejection of a per se rule barring third-party tort claims in the absence of a physician-patient relationship. *Squeo* v. *Norwalk Hospital Assn.*, supra, 573–74. *Squeo* does not disturb our assessment of Connecticut precedent in *Jarmie* that this court is reluctant to extend the duties of medical professionals to nonpatient third parties. See id., 580–81 (concluding that "bystander to medical malpractice may recover for the severe emotional distress that he or she suffers as a direct result of contemporaneously observing gross professional negligence such that the bystander is aware, at the time, not only that the defendant's conduct is improper but also that it will likely result in the death of or serious injury to the primary victim").

Further, the majority's reliance on *Squeo* illustrates a problem with the majority's efforts to limit this case to the precise circumstances presented. The majority effectively uses *Squeo* as evidence that we have already stepped through the door left open in *Jarmie*, and, "if our decision in *Squeo* has not resulted in the parade of horribles that the dissent invokes . . . then we can have some reassurance that the alarmist warnings in the present case will be no more prescient." As I argue subsequently in this dissenting opinion, the public policy concerns implicated in the context of STDs apply with equal or greater force to any number of different infectious diseases, a contention the majority disputes. Just as the majority relies on *Squeo* to support an expansion of liability under the circumstances of the present case, this court may subsequently rely on today's decision as a precedent to support further expansions of liability in other contexts. Because I find the majority's efforts to distinguish STDs from other infectious diseases in the context of the present case unavailing, I see it as unlikely that, in the future, the Connecticut Bar or even the courts of this state will view the precedential value of today's decision as limited to STDs.

[3] I disagree with the majority's observation that, despite quoting "heavily" from *Jarmie*, I "barely [acknowledge]" that the present case raises a different question than the one at issue in *Jarmie*. I believe my agreement with the majority's observation that *Jarmie* left open the possibility that a duty may exist in a case where the victim is identifiable is acknowledgment enough that this case cannot be simply disposed of under *Jarmie*.

The majority further states that "it would be a mistake . . . to simply conclude that *Jarmie* disposes of the issue presented in this case without carefully evaluating the fundamentally distinct considerations that characterize the context of communicable diseases." I take no issue with that statement. In fact, the standard articulated by *Jarmie* requires evaluation of policy considerations. The majority and I have each evaluated the policy considerations, and conclude differently as to whether they militate in favor of or in opposition to recognition of a duty in this case. In essence, the majority believes certain policy concerns are so strong that this court should walk through the door left open in *Jarmie*. I, however, would stop at the threshold of that doorway.

I further emphasize that the majority misunderstands this dissent as standing for my belief "that, for reasons of public policy, we *never* should impose on physicians any duties beyond those established by the legislature." (Emphasis added.) Instead, I take the position that, when, as in the present case, our court is so deeply divided as to whether public policy concerns support recognition of a legal duty, and when the implications of such recognition of a duty may be so vast, the legislature is in a far better position to make such a determination given its institutional advantages with respect to considering and receiving evidence as to matters of public policy. See, e.g., *Cefaratti* v. *Aranow*, 321 Conn. 593, 632–33, 141 A.3d 752 (2016) (*Zarella, J.*, dissenting) (observing that, in deciding whether doctrine of apparent authority or apparent agency should be available to tort plaintiffs, "[i]t is not the role of this court to strike precise balances among the fluctuating interests of competing private groups . . . such as, on the one hand, people who are similarly situated to the plaintiff . . . and, on the other hand, hospitals and other health-care institutions," and noting that this "function has traditionally been performed by the legislature, which has far greater competence and flexibility to deal with the myriad complications [that] may arise from the assignment of liability" [citation omitted; internal quotation marks omitted]); *Campos* v. *Coleman*, 319 Conn. 36, 65–66, 123 A.3d 854 (2015) (*Zarella, J.*, dissenting) ("[T]his court has the authority to change the common law to conform to the times. In a society of ever increasing

interdependence and complexity, however, it is an authority this court should exercise only sparingly. . . . [T]he legislature, unlike this court, is institutionally equipped to gather *all* of the necessary facts to determine whether a claim for loss of parental consortium should be permitted and, if it should, how far it should extend. The legislature can hold public hearings, collect data unconstrained by concerns of relevancy and probative value, listen to evidence from a variety of experts, and elicit input from industry and society in general. Further, elected legislators, unlike the members of this court, can be held directly accountable for their policy decisions." [Citation omitted; emphasis in original; footnote omitted.]); *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 439, 119 A.3d 462 (2015) ("balancing of interests that are accommodated by statutes of limitations" is "factual [matter] within the legislative purview"); *State* v. *Lockhart*, 298 Conn. 537, 574, 4 A.3d 1176 (2010) (observing that "determining . . . parameters" of state constitutional rule requiring recording of custodial interrogations "requires weighing competing public policies and evaluating a wide variety of possible rules" and noting that "such determinations are often made by a legislative body because it is in a better position to evaluate the competing policy interests at play").

[4] Before addressing the precedents of other jurisdictions and public policy considerations, the majority states that, "[i]n *Jarmie*, after we concluded that Connecticut precedent did not bar the imposition of the duty at issue, we proceeded to look to sister state authority and also to consider whether various policy factors favored the imposition of such a duty." Although I agree that Connecticut precedent did not per se bar the imposition of such a duty, I emphasize that this court left little doubt in *Jarmie* as to how Connecticut precedent viewed the imposition of similar duties on health care providers. As noted previously, this court explicitly concluded that, "although there is no directly comparable Connecticut case law on which to rely, our precedent, in general, does not support extending the duty of care . . . because, with one limited exception that does not apply . . . we repeatedly have declined, in a variety of situations, to extend the duty of health care providers to persons who are not their patients." *Jarmie* v. *Troncale*, supra, 306 Conn. 593.

[5] The majority contends, however, that such confidentiality concerns may be present in other cases, but do not exist in a case like this, in which a plaintiff will ostensibly have full access to the pertinent medical records via the patient, her exclusive romantic partner. But this reasoning would further limit the majority's holding to the alleged facts of this case, meaning that in a nearly identical future scenario, in which all that is different from the present case is that the patient is uncooperative with the plaintiff's action with regard to the disclosure of medical records—such as might happen if the relationship dissolved—there might be no recognition of a duty. I am aware of no Connecticut case law suggesting that our recognition of a duty of care should turn on the alleged willingness of a nonparty patient to have his or her medical records made available in a nonpatient's action sounding in ordinary negligence. Consequently, I respectfully find the majority's response to confidentiality concerns—that such concerns may be present in other cases, but do not exist in the present case—unconvincing.

[6] I note that in its discussion of public policy concerns, the majority focuses a great deal of attention on public health concerns, namely, the diagnosis and treatment of infectious diseases. The majority suggests that in the context of such diseases, "a physician's duties and loyalties necessarily must be divided between the patient and other people whom the patient may infect," and "the principle that a physician's duty to protect the broader public health and to help to deter the spread of contagious diseases at times transcends the physician's duty to his or her individual patient has long been codified in federal and state law."

[7] The dissenting justice in *DiMarco* observed that "the dangers of adopting a negligence concept of duty analyzed in terms of scope of the risk or foreseeability are considerable and are to be avoided. These dangers include . . . the prospect of inducing professionals to narrow their inquiries into the client or patient situation, to the detriment of the client or patient, so as to avoid possible liability toward third parties which might come from knowing 'too much.' " (Footnote omitted.) *DiMarco* v. *Lynch Homes-Chester County, Inc.*, supra, 525 Pa. 565–66 (Flaherty, J., dissenting).

[8] The majority attempts to distinguish these cases as not analogous enough to the precise circumstances of the present case, leaving the majority with a handful of cases it deems worthy of consideration. Even if I were to agree with the majority's winnowing of the list of cases we should consider to be relevant, I would hardly call a four to one majority in favor of the majority's

position a convincing consensus among our sister courts, especially when so few courts have weighed in on the precise question presented.

[9] Finally, even if I were to agree with the majority's recognition of a direct duty of care on the facts of the present case, which I respectfully do not, the future ramifications of the majority's opinion would nevertheless give me pause. Although the majority repeatedly cautions that its holding is limited and narrow, I nevertheless find this contention troubling because its implications portend just the opposite result. First, although the majority states that its decision is limited strictly to cases involving the diagnosis of STDs, the public policy concerns discussed therein apply with equal or even greater force to any number of different infectious diseases, such as chickenpox, influenza, and measles. It is likely that in cases with identifiable nonpatient third parties, the majority's opinion in this case will be held up as a logically convincing precedent to further extend the potential liability of health care providers. Second, the majority's foreseeability analysis is inherently subjective. What if the physician has awareness of a romantic partner's existence independent of knowledge obtained from the patient, such as through a social relationship? There is little reason why this court's logic would not counsel in favor of recognizing a duty in such a case, concerns of which would be exacerbated should the majority's decision be extended beyond STDs to other infectious diseases, such as influenza. Put differently, the majority's opinion sets a precedent that will easily open the floodgates to a great expansion of potential third party liability for health care providers.

---